# Exhibit 1

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| HYEWOONG YOON | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 1:19-cv-10278-PBS |
| | ) |
| SEYEON LEE, | ) |
| | ) |
| Defendant. | ) |

## AFFIDAVIT OF JAE-EUN SHIN

I Jae-eun Shin, do hereby depose and state as follows:

1.   I am in-house counsel at Korean Broadcasting System ("KBS").   I make this Affidavit on personal knowledge, except where specifically stated otherwise.

2.   I am an attorney licensed to practice law in Korea.   I was admitted to the Korean Bar Association in 2006, and I joined KBS's legal department as an in-house counsel in 2009, where I continue to work today. All lawyers who are members of the Korean Bar Association receive as part of their formal legal education training on the procedures for filing and pursuing a civil action in the Korean court system.   The information contained in this affidavit is based on my education and experience as a lawyer with over a decade of experience as a civil litigator.

### KBS Generally

3.   KBS is Korea's national public broadcaster. It operates in radio, television, online, and other media services. It is a public corporation that is funded by the Korean government and generates revenue from licensing fees and advertising. KBS has always been a public corporation and citizen of Korea from its inception to the present.

4.   KBS was founded as Korea's national public broadcaster to establish a culture of fair and objective broadcasting in Korea and to provide effective broadcasting services both at home and abroad, pursuant to Article 43 of the Broadcasting Act (the "Act"). *See* Ex. 1a. (original and translation of the relevant excerpts of the Act) attached hereto. According to Article 44 of the Act, KBS must be impartial and serve the public interests. In particular, according to Article 54(1), Item No. 5 of the Act, KBS shall provide overseas broadcasting services to promote Korea's relationships and cultural and economic exchanges with other countries as well as social educational broadcasting services for Korean nationals who reside abroad.

5.   The President of Korea has the power to appoint the President of KBS and its Board of Directors. The procedures for appointing the President and Directors of KBS are addressed in Articles 46 and 50 of the Act. According to Article 46 of the Act, the Board of Directors of KBS shall consist of eleven non-permanent directors. Each Director shall be recommended by the Korea Communications Commission ("KCC"), which is the regulatory entity responsible for regulation of broadcast and communications services in Korea. Its members are appointed by the President of Korea. According to Article 50(2) of the Act, the President of KBS is be appointed by the President of Korea upon the recommendation by the Board of Directors. The President of KBS must go through a confirmation proceeding before the National Assembly before his appointment is

2

finalized.

6.   The finances for KBS are closely monitored and overseen by the Korean government. As required by Article 59 of the Act, KBS submits an annual budget for its operations and a statement of accounts to KCC. Upon receipt of the statement of accounts, KCC submits it to the Board of Audit and Inspection of Korea ("BOAI"), whose authority and primary function under the Constitution is to audit the accounts of the government and public institutions. Upon review by BOAI, the operating budget and statement of accounts of KBS are submitted to the National Assembly for final approval.

7.   KBS was founded with the sole capital investment of KRW (South Korean won) 300 billion by the Korean government (Article 43(5) of the Act). KBS's expenses are covered by revenue sources specified under Article 56 of the Act, including television licensing fees, advertising revenues, and government subsidies for overseas broadcasting. Under Article 65 of the Act, the licensing fees that KBS can charge are approved by a resolution of the Board of Directors with final approval required by a majority vote of the National Assembly. Furthermore, under Article 5(2) of the Act, commercials that KBS may broadcast are limited to those entrusted by the Korea Broadcast Advertising Corporation, which is the only government-funded public media representative in Korea.

8.   In addition, under Articles 69(8) of the Act, KBS is required to take certain measures to ensure that disabled individuals are able to access its programming through specialized features – *e.g.*, closed captioning. To pay for such measures, KBS may receive additional government subsidies.

9.   Article 53 of the Act prohibits KBS employees from having any other paid employment. For transparency, the average annual salary of KBS employees and business expenses of key executives of KBS are posted on the KBS website.

**Plaintiff's Lawsuits Against KBS in the United States and Korea**

10. On or about March 21, 2019, KBS received a copy of the Complaint that Mr.
Hae-woong Yoon filed against KBS with the U.S. District for the District of
Massachusetts on February 13, 2019 (the "U.S. Case").

11. In the Complaint in the U.S. Case, Plaintiff alleges, *inter alia*, that (i) Ms. Se-
yeon Lee, a KBS reporter, interviewed him over the phone and recorded their telephone
conversation without his consent (¶¶ 14-15), (ii) the audio recording was subsequently
broadcast by KBS on November 15 and 16, 2018 (¶ 16), and (iii) the broadcast contained
false information about him and his father, Mr. Hong-geun Yoon, including a statement
that Mr. Hong-geun Yoon had used the funds of Genesis BBQ Co., a major fried chicken
chain in Korea founded by Mr. Hong-geun Yoon ("BBQ"), to pay for Mr. Hae-woong
Yoon's education and living expenses in the U.S (the "News Report"). *Id.* at ¶¶ 18-21.
Mr. Hae-woong Yoon further alleges that the News Report defamed him and that the
above audio recording violated the Massachusetts wiretapping statute (Mass. Gen. Laws
Ch. 272, §99). *Id.* at ¶¶ 25-31. As a result, Plaintiff alleges that he and BBQ sustained
financial losses and that he suffered from mental distress. *Id.*

12. Three months prior to commencing the U.S. Case, Mr. Hae-woong Yoon had
commenced legal actions against KBS in Korea based on the same nucleus of facts alleged
in the U.S Case. These legal actions in Korea are ongoing.

13. On November 9, 2018, Mr. Hae-woong Yoon, Mr. Hong-geun Yoon, and BBQ
(collectively referred to as the "Korea Case Plaintiffs") filed an application for
preliminary injunction against KBS with the Seoul Southern District Court and sought a
court order barring KBS from broadcasting the News Report on the basis that it contained
false information – the same information that Mr. Hae-woong Yoon has alleged is false in

the US Case. On November 15, 2018, the Seoul Southern District Court ruled on the Korea Case Plaintiffs' injunction application, allowing KBS to broadcast the News Report, but ordering KBS to reflect the Plaintiffs' opposing views in the News Report (the "Injunction Order").   *See* Ex. 2a, Injunction Order (original and English translation) attached hereto.   The Seoul Southern District Court also ruled that KBS shall pay the Plaintiffs a sum of 20 million South Korean won ("KRW") each time KBS violated the Injunction Order.

14. On November 20, 2018, the South Korean Plaintiffs filed a lawsuit against KBS, Ms. Se-yeon Lee, and Mr. Ju-hyung Lee (who was involved in producing the News Report, together with KBS and Ms. Se-yeon Lee referred to as the "Defendants") with the Seoul Southern District Court, seeking a court order compelling KBS to correct the News Report and seeking damages in the sum of KRW 3 billion (or approximately $2.57 million[1]) on the basis that the defendants defamed them by broadcasting the News Report (the "Korean Case").   *See* Ex. 2 to Memo. in Support of Motion to Dismiss. In that lawsuit, the Korean Case Plaintiffs alleged that as a result of the Defendants' tortious acts, they sustained mental distress and/or financial losses.

15. Meanwhile, the Korean Case Plaintiffs have also filed a petition with the Seoul Southern District Court to enforce the Injunction Order, alleging that KBS violated the terms of the Injunction Order and is liable to Plaintiffs in the amount of KRW 20 million for each such violation. The Plaintiffs have also filed a criminal complaint against Ms. Se-yeon Lee, Mr. Ju-hyung Lee, and Mr. Yang Sung-dong, President and CEO of KBS, alleging that they committed a crime of defamation under the Korean Criminal Code.

16. A related criminal prosecution is also pending against Mr. Hong-geun Yoon in

---

[1] According Yahoo Finance, the currency rate of $1 = KRW 1,144.56 as of April 30, 2019, 3:50 p.m. EST.

Korea, on the charge that he had embezzled company funds to pay for his son's (Mr. Hae-woong Yoon) education in the U.S. Whether or not the contents of the News Report are true would be relevant to the outcome of this investigation and possible prosecution against Mr. Hong-geun Yoon.

17. I am representing and defending KBS in the ongoing Korean Case. If the Seoul Southern District Court decides in favor of the Korea Case Plaintiffs and awards them damages, and such decision is upheld by the higher courts in Korea, the Korea Case Plaintiffs would be compensated in Korea. In the same vein, if the investigative authorities in Korea find that Ms. Se-yeon Lee, Mr. Ju-hyung Lee, and Mr. Yang Sung-dong committed a crime of defamation and indict them, the foregoing individuals would be tried by the courts in Korea.

18. KBS continues to spend a significant amount of time and money to defend against the Korean Case and other related legal actions that the Korea Case Plaintiffs have taken against KBS in Korea. The US Case has been exceedingly burdensome and costly for KBS to defend against to date, despite it essentially being duplicative of the Korean Case. In the Korean Case, the Plaintiffs may submit evidence and briefs in support of their claims.   To collect evidence from the defendants or third parties, they may also request the Seoul Southern District Court issue document production orders and/or fact clarification requests. Further, they may ask for leave of court to summon witnesses under their control to appear in court and testify, including non-party witnesses.

19.  KBS is located in Korea, and Ms. Se-yeon Lee, who interviewed Mr. Hae-woong Yoon, and Mr. Ju-hyung Lee, who helped to produce and broadcast the News Report, reside and work in Korea. Neither of these individuals is fluent in English, and both would need an interpreter to testify in the U.S. Case. Furthermore, other KBS

employees who were involved in Mr. Hae-woong Yoon's interview and/or the production of the News Report reside and work in Korea, and they either do not speak English at all, or they do not speak English well enough to testify in the U.S. Case without the assistance of an interpreter.   Similarly, Mr. Hong-geun Yoon resides in Korea, and BBQ is a company incorporated under the laws of Korea whose headquarters is located in Korea.

20.   All relevant documents and evidence including materials that were prepared and/or reviewed to produce and broadcast the News Report are all located in Korea. Such materials were also prepared in Korean, and thus, they would need to be translated into English at a significant cost for any submission in the U.S. Case. Moreover, KBS maintains its computer networks and servers in Korea, and thus, any discoverable electronic files will be found on those servers.

21. KBS has few assets inside the United States. Those assets include leased office space in New York City and Washington D.C. for its foreign correspondents. Those assets are *de minimus* compared to the damages Plaintiff is seeking in the U.S. case. Any judgment secured in the United States would need to be domesticated in South Korea through the filing of a separate action. Korean law provides that a judgment obtained in Korea is automatically enforceable.

22. Korea is a signatory to the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil and Commercial Matters.   However, Korea has issued a reservation that a Letter of Request issued for purposes of obtaining pre-trial discovery will not be honored.   This means any subpoena issued by a United States District Court directed to a third-party residing in Korea will not be enforced by the courts in Korea.

### The Korean Justice System

23. The Korean trial court system is comprised of three levels – (i) court of first

instance (trial court), (ii) court of second instance (appeals court), and the Supreme Court

(highest court). The court of first instance consists of one or more judges reviewing the

evidence and testimony presented by the parties. Once all the evidence is presented by the

parties, a written opinion is issued. The court of second instance reviews the lower court's

legal analysis of the law as well as facts. The parties to a civil action are permitted to

present additional evidence. The court of final appeal is the Supreme Court whose

jurisdiction is substantially limited to reviewing and ruling on legal errors committed by

the court of second instance.

24. The procedure for filing a civil action is set by the Korean Code of Civil

Procedure.   It can be fairly summarized as follows:

A. A complaint setting forth the claim and attached documentary evidence
referred to therein is filed with the court having jurisdiction over the
case.   The complaint is then served on the defendant.   Service is
effected ex officio.

B. After the defendant is served with the complaint, the defendant must file
a response within 30 days from the date of service of the complaint.

C. Upon submission of an answer by the defendant, the court will hold
hearings and receive evidence and testimony. A court may conduct one or
more preparatory hearings to clarify the issues before it holds formal
hearings.

D. The court will hold a series of hearings to hear the testimony of any
witness (fact or law), the parties' oral arguments, and presentation of
evidence for the court's consideration. The hearings are typically set
apart by two to three-week intervals. The number of hearings will depend
on the complexity of the case, the number of material issues, the number
of witnesses, and such other factors as the court deems necessary to
adjudicate the matter. These hearings provide that each party may submit
evidence and briefs in support of their respective claims. In order to
collect evidence from the counterparty or third parties, either party may
request that the court issue document production orders and/or fact
clarification requests. Any party may seek leave of court to summon
witnesses under the party's control to appear in court and testify, or
request the court summon witnesses who are not under the party's
control to testify in court. In the alternative, the parties may submit
witness statements.

E.    The court will close the hearings once it determines that the parties have submitted their respective briefs and oral and written evidence on material issues. Thereafter, the court will announce a judgment—usually in about two to four weeks. The average length of a civil action is approximately eight to 14 months for the courts of first instance (*e.g.,* Seoul Central District Court) to render its decision.

F.    Either party may appeal the decision of the court of first instance to the court of second instance (e.g., the Seoul High Court). The standard of review by the courts of second instance is *trial de novo*, and both parties may present new arguments and submit new evidence, if any. Just as the courts of first instance did, the courts of second instance hold a series of hearings to consider the parties' oral and written submissions as well as to hear witness testimony, if any, until the court closes the hearings to announce a judgment date. Absent special circumstances, it usually takes six to ten months for the courts of second instance to render a judgment.

G.    Either party may also appeal the judgment of the court of second instance to the Supreme Court, Korea's highest court. The standard of review by the Supreme Court is limited to review of legal issues.

Signed under the penalties of perjury, this 2nd day of May, 2019.

_____

Jae-eun Shin
In-house counsel, Korean Broadcasting System

# Exhibit 1a

**BROADCASTING ACT**
**CHAPTER IV KOREA BROADCASTING SYSTEM**

**Article 43 (Establishment, etc.)**
(1) The Korean Broadcasting System (hereafter referred to as the "System" in this Chapter) shall be established as the State's key broadcasting in order to fix a fair and sound broadcast culture, and to efficiently implement the broadcasts for home and abroad.
(2) The System shall be a juristic person.
(3) The location of the System's principal office shall be prescribed by the articles of incorporation.
(4) The System may, if deemed necessary for carrying out its business, establish the regional broadcasting stations upon passage of a resolution by the board of directors.
(5) The System shall have a capital of three hundred billion won, and its entire amount shall be contributed by the Government.
(6) The time and method of payment of the capital under paragraph (5) shall be in accordance with a decision by the Minister of Strategy and Finance. <*Amended by Act No. 8867, Feb. 29, 2008*>
(7) The System shall come into existence by effecting the registration of incorporation at the location of its principal office.
(8) The registration of incorporation under paragraph (7), a registration of establishment of a regional broadcasting station, a registration of moving, a registration of modification, and other matters necessary for a registration of the System shall be prescribed by Presidential Decree.

**Article 44 (Public Responsibility of System)**
(1) The System shall bring into reality the objectives and public responsibility of broadcasting, and the impartiality and public interest nature of broadcasting.
(2) The System shall endeavor to offer the broadcast services of superior quality to the people having no concern with the region and circumstances.
(3) The System shall research and develop the new broadcast programs, broadcast services and broadcast technologies which may contribute to the public interest of the viewers.
(4) The System shall develop the broadcast programs, and broadcast them, which may promote the national culture and ensure a homogeneity of the nation, with the objects home and abroad.

**Article 45 (Matters Stated in Articles of Incorporation)**
(1) Matters of the following subparagraphs shall be stated in the articles of incorporation of the System:
1. Objectives;
2. Title;
3. Location of the principal office;
4. Matters concerning the organization of the System, and the chairperson of the board of directors, directors, executive organs and personnel;
5. Matters concerning the operation of the board of directors;
6. Matters concerning its duties and their execution;
7. Matters concerning the settlement of viewers' complaints and the protection of viewers;
8. Matters concerning a modification of the articles of incorporation;
9. Matters concerning the issue of bonds and the borrowing of funds;
10. Matters concerning the stocks or investment certificates;
11. Matters concerning the accounting such as disposition of profits and losses;
12. Matters concerning the method of public notification;
13. Other matters as prescribed by Presidential Decree.
(2) When the System intends to modify the articles of incorporation, it shall obtain authorization of the Korea Communications Commission. <*Amended by Act No. 8867, Feb. 29, 2008*>

**Article 46 (Establishment, Operation, etc. of Board of Directors)**

(1) The System shall have a board of directors as the highest decision-making body for the management of the System in order to guarantee the independence and public nature of the System.

(2) The board of directors shall be comprised of eleven directors, including the Chairman of the board of directors.

(3) The directors shall be recommended by the Korea Communications Commission in consideration of their typicality of different fields, and appointed by the President. <Amended by Act No. 8867, Feb. 29, 2008>

(4) The Chairman of the board of directors shall be elected by the board of directors by mutual vote.

(5) The directors, including the Chairman of the board of directors, shall be non-permanent.

(6) The Chairman of the board of directors shall convene meetings of the board of directors, and preside over such meetings.

(7) The board of directors shall pass resolutions with the affirmative vote of a majority of the registered directors.

(8) When the Chairman of the board of directors is unable to perform his/her duties due to extenuating circumstances, one of the directors shall act for him/her, as prescribed by the articles of incorporation.

(9) The meetings of the board of directors shall be open to the public: Provided, That the foregoing shall not apply in any of the following circumstances, following a resolution by the board of directors: <Newly Inserted by Act No. 12677, May 28, 2014>

1. Where the any matter classified as confidential or the disclosure of which is restricted under other Act and subordinate statute are included;

2. Where an open meeting is deemed likely to harm the reputation or rightful interests of an individual, corporation or organization;

3. Where the disclosure of matters concerning audit, personal management, etc. is likely to substantially hinder fair performance of duties.

**Article 47 (Term of Directorship)**

(1) The term of the office of a director shall be three years.

(2) If a vacancy occurs on the board, a substitute director shall be appointed under the provisions of Article 46 within thirty days since the occurrence of the vacancy, and the term of the substitute director shall be the remaining term of his predecessor.

(3) A director whose term expires shall carry out his duties until his successor is appointed.

**Article 48 (Grounds for Disqualification of Directors)**

(1) The following persons shall be disqualified as a director of the System:

1. A non-Korean national;

2. A member of a political party under Article 22 of the Political Parties Act, or a person for whom three years have not passed after his/her status as member of a political party was lost under the same Act;

3. A person referred to in the subparagraphs of Article 33 of the State Public Officials Act;

4. A person for whom three years have not passed after he/she was retired from public office assigned through an election under Article 2 of the Public Official Election Act;

5. A person for whom three years have not passed after he/she served as an advisor or a consultant on broadcasting, communications, law, management, etc. to make a candidate elected in a presidential election under Article 2 of the Public Official Election Act;

6. A member of the Presidential Transition Committee established under Article 6 of the Presidential Transition Act for whom three years have not passed after his/her status as Committee member was lost.

(2) Detailed scope of persons who serve as advisors or consultants under paragraph (1) 5 shall be prescribed by Presidential Decree.

**Article 49 (Functions of Board of Directors)**

(1) The board of directors shall deliberate on and resolve the matters falling under any of the following subparagraphs:

1. Matters concerning the public responsibility of the broadcasts conducted by the System;

2. Basic operational plans for the broadcasts conducted by the System;

3. Plans for budget and funds;

4. Use of reserve funds and a carrying forward of the budget;

5. Settlement of accounts;

6. Evaluation of management of the System, and its public announcement;

7. Proposal for the appointment of the president and auditor, and approval of the appointment of the vice president;

8. Establishment and closure of the regional broadcasting stations;

9. Acquisition and disposition of the permanent properties;

10. Borrowing of long term loans, and issuing of bonds and the plans for redemption;

11. Disposition of the profits and losses;

12. Contributions to other enterprises;

13. Modification of the articles of incorporations;

14. Formulation, amendment and abolition of the regulations as prescribed by the articles of incorporation;

15. Other matters deemed as especially necessary by the board of directors.

(2) The board of directors may, if deemed as especially necessary, request the auditor to make an audit of the System.

### Article 50 (Executives)

(1) The System shall have, as its executives, one president, up to two vice presidents, up to eight managing directors, and one auditor.

(2) The president shall be appointed by President upon a proposal by the board of directors. In such cases, the president shall undergo a personnel hearings conducted by the National Assembly. *<Amended by Act No. 12677, May 28, 2014>*

(3) Where the board of directors makes a proposal for the president under paragraph (2), it shall present the criteria and grounds for the proposal.

(4) The auditor shall be appointed by the Korea Communications Commission upon a proposal by the board of directors. *<Amended by Act No. 8867, Feb. 29, 2008>*

(5) The vice presidents and managing directors shall be appointed by the president: Provided, That the consent of the board of directors shall be obtained in appointing the vice presidents.

(6) Articles 47 and 48 concerning directors shall apply mutatis mutandis to the term of office and grounds for disqualification of executives.

### Article 51 (Duties, etc. of Executive Organs)

(1) The president shall represent the System, exercise the overall control over the operation of the System, and assume the responsibility for the results of business management.

(2) When the president is unable to carry out his duties due to unavoidable reasons, a vice president shall act for him, and when the vice presidents are unable to carry out their duties due to unavoidable reasons, the person as prescribed by the articles of incorporation shall act for them.

(3) The president may, under the conditions as prescribed by the articles of incorporation, select and appoint, from among its personnel, an agent who has the authority to take all judicial or extra-judicial actions with regard to the System's business.

(4) The auditor shall audit the matters concerning the business and accounts of the System.

(5) The president and the auditor may appear before the board of directors, and make a statement of their opinions.

### Article 52 (Appointment and Dismissal of Personnel)

The personnel of the System shall be appointed or dismissed by the president under the conditions as prescribed by the articles of incorporation.

### Article 53 (Liability as Matter of Duties of Directors and Executive Organs and Personnel)

(1) The directors and the executive organs of the System shall be prohibited from performing any transaction with the System and the directors shall also be prohibited from being involved in any deliberation and any resolution of the matters of the board of directors, which are related to their own interests and the interests of persons with

whom they have kinship relations provided for in the provisions of Article 777 of the Civil Act. <*Newly Inserted by Act No. 8301, Jan. 26, 2007*>

(2) The executive organs and personnel of the System may not engage in the duties aiming at profit-making in addition to their duties.

(3) The executive organs, personnel or the persons once engaged in the relevant duties shall not divulge or make fraudulent use of any secrets of the System which have come to their knowledge as a matter of duties.

**Article 54 (Operations)**

(1) The System shall attend to the following business: <*Amended by Act No. 12093, Aug. 13, 2013*>

1. Execution of radio broadcasts;

2. Execution of television broadcasts;

3. Execution of broadcasts through new broadcasting media such as a satellite broadcast;

4. Installation, operation and management of broadcasting facilities;

5. Execution of the overseas broadcasts required by the State (broadcasts aiming at the international friendship and the improvement of international understanding and the cultural and economic exchanges) and of the social education broadcasts (broadcasts aiming at the advancement of national homogeneity for the Korean residents in foreign countries);

6. Support for the transmission of broadcasts conducted by the Educational Broadcasting System under the Korea Educational Broadcasting System Act;

7. Establishment and operation of an organization for the settlement of viewers' complaints and the protection of viewers;

8. Operation and management of the organizations attached to the System;

9. Implementation of the cultural broadcast events, and the international exchange of cultural broadcasts;

10. Survey, research and development concerning the broadcasting;

11. Profit-making projects incidental to the affairs under subparagraphs 1 through 10.

(2) The State may support the affairs falling under paragraph (1) 5 with subsidies.

(3) The System may, upon the passage of a resolution by the board of directors, contribute all or part of the relevant capital for the affairs falling under each subparagraph of paragraph (1), or for a corporation attending to the affairs similar to them.

**Article 55 (Settlement of Accounts)**

(1) The System's fiscal year shall be in accordance with the Government's fiscal year.

(2) Government Enterprise Budget Act shall apply mutatis mutandis to the standards and procedures, etc. for the settlement of accounts of the System. <*Amended by Act No. 9280, Dec. 31, 2008*>

**Article 56 (Revenue Sources)**

Expenses of the System shall be met by the television broadcast receiving fees collected under Article 64, but such expenses may be covered by revenues prescribed by Presidential Decree, such as revenues from commercials, if necessary for properly performing its affairs as intended.

**Article 57 (Compilation of Budget)**

(1) The System's budget shall be compiled by the president and confirmed by the passage of a resolution at the board of directors. The same shall apply where the budget is modified due to a modification in the operational plans occurring after the budget is confirmed or other unavoidable reasons.

(2) The president of the System may administer the budget in accordance with the preceding year's budget where the budget is not confirmed not later than the commencement of fiscal year due to force majeure or other unavoidable reasons. In this case, the budget executed in accordance with the quasi-budget shall be considered to have been executed in accordance with the budget of current year.

**Article 58 (Formulation of Operational Plans)**

(1) The president of the System shall, where the budget is confirmed under Article 57, formulate without delay the operational plans in accordance with the budget of current year upon the passage of a resolution by the board of directors.

(2) The president of the System shall submit the operational plans for current year formulated under the provisions of paragraph (1) to the Korea Communications Commission within two months after the budget is confirmed. *<Amended by Act No. 8867, Feb. 29, 2008>*

## Article 59 (Submission of Statement of Accounts)

(1) The president of the System shall submit the statement of accounts for the preceding fiscal year to the Korea Communications Commission not later than two months after the conclusion of each fiscal year. *<Amended by Act No. 8867, Feb. 29, 2008; Act No. 12033, Aug. 13, 2013>*

(2) The statement of accounts under paragraph (1) shall be accompanied by any of the following documents: *<Amended by Act No. 12033, Aug. 13, 2013>*

1. Financial statements and their attached documents;

2. Other documents necessary for clarifying the content of the settlement of accounts, prescribed by Presidential Decree.

(3) The Korea Communications Commission shall submit the statement of accounts under paragraph (1) and documents under paragraph (2) (hereafter referred to as "statement of accounts, etc." in this Article) to the Board of Audit and Inspection by April 10 each year. *<Amended by Act No. 8867, Feb. 29, 2008; Act No. 12033, Aug. 13, 2013>*

(4) The Board of Audit and Inspection shall inspect the statement of accounts, etc. received under the provisions of paragraph (3), and forward the relevant results to the Korea Communications Commission by not later than June 20. *<Amended by Act No. 8867, Feb. 29, 2008; Act No. 12033, Aug. 13, 2013>*

(5) The Korea Communications Commission shall accompany the inspection result of the Board of Audit and Inspection under paragraph (4) to the statement of accounts, etc. under paragraph (3), and shall submit it to the National Assembly by not later than June 30. *<Newly Inserted by Act No. 12033, Aug. 13, 2013>*

(6) The settlement of accounts of the System shall be confirmed upon approval by the National Assembly, and the president of the System shall make a public announcement thereof. *<Newly Inserted by Act No. 12033, Aug. 13, 2013>*

## Article 60 (Report of Acquisition, etc. of Real Estate)

The System shall, where it acquires or disposes of any real estate, or modifies the purpose at the time of its acquisition, report to the Korea Communications Commission thereon without delay. *<Amended by Act No. 8867, Feb. 29, 2008>*

## Article 61 (Subsidies, etc.)

The State may subsidize part of the expenses required for the operation of the System, loan the financial funds, or accept the debentures of the System within the limit of the budget, under the conditions as prescribed by Presidential Decree.

## Article 62 (Entrustment of Goods Purchase and Construction Contracts)

The president of the System may entrust the Administrator of the Public Procurement Service with the purchase of required materials or the conclusion of contracts for the construction of facilities, where deemed necessary.

## Article 63 (Audit)

(1) Audits of the System shall be classified as internal audits and external audits.

(2) The auditor of the System shall conduct the internal audits pursuant to the provisions of the articles of incorporation.

(3) The Board of Audit and Inspection shall conduct the external audits of the System under the conditions as determined by the Board of Audit and Inspection Act.

**Article 64 (Registration of Television Receivers and Payment of Receiving Fees)**
Any person who possesses a television receiver (hereinafter referred to as "TV set") in order to receive television broadcasts shall register the TV set with the System, and pay a television broadcast receiving fee (hereinafter referred to as the "receiving fees") under the conditions as prescribed by Presidential Decree: Provided, That with regard to the TV sets as prescribed by Presidential Decree, their registration may be exempted, or all or part of the receiving fees may be exempted or reduced.

**Article 65 (Determination of Receiving Fees)**
The amount of receiving fees shall be fixed after a deliberation on it and the passage of resolution by the board of directors, and obtaining approval of the National Assembly via the Korea Communications Commission, and the System shall impose and collect them. *<Amended by Act No. 8867, Feb. 29, 2008>*

**Article 66 (Collection of Receiving Fees, etc.)**
(1) The System shall, in collecting the receiving fees under the provisions of Article 65, and where a person liable to pay the receiving fees fails to pay them within the relevant payment period, collect an additional charge in the amount equivalent to the rate as prescribed by Presidential Decree within the limit of 5/100 of the relevant receiving fees.
(2) The System may impose and collect from any possessor of a TV set which is not registered under Article 64 a punitive surcharge equivalent to the receiving fees for one year.
(3) The System may, in collecting the receiving fees under Article 65,and the additional charge or the punitive surcharge under paragraphs (1) and (2), and where there exists any delinquency of payment, collect them in accordance with the examples of disposition on the national tax in arrears by obtaining approval of the Korea Communications Commission. *<Amended by Act No. 8867, Feb. 29, 2008>*

**Article 67 (Entrustment of Registration of TV Sets and Collection)**
(1) The System may entrust the Mayors/Do governors with the affairs of collecting the receiving fees under Article 66.
(2) The System may entrust the affairs of registering TV sets and of collecting the receiving fees to the manufacturer, distributor, importer-distributor of TV sets, or other persons designated by the System.
(3) Where the System entrusts the affairs of collecting the receiving fees under the provisions of paragraphs (1) and (2), it shall pay the fees under the conditions as prescribed by Presidential Decree.

**Article 68 (Use of Receiving Fees)**
The System may use the receiving fees collected under the provisions of Articles 65 and 66 for the support as a revenue source to the Educational Broadcasting System under the Korea Educational Broadcasting System Act under the conditions as prescribed by Presidential Decree. *<Amended by Act No. 12033, Aug. 13, 2013>*

## CHAPTER V OPERATION, ETC. OF BROADCASTING BUSINESS

**Article 69 (Programming, etc. of Broadcast Programs)**
(1) A broadcasting business entity shall program the broadcast programs to suit the purposes of impartiality, public nature, diversity, balance, truth, etc.
(2) A broadcasting business entity that engages in general programming shall ensure a well-balanced presentation of subject matters of each field, such as politics, economy, society and culture.
(3) A broadcasting business entity that engages in general programming shall program the broadcast programs to include news reports, culture and entertainment in compliance with the standards prescribed by Presidential Decree, and program such broadcast programs to be well-coordinated with each other. In such case, there shall be no preponderancy of the broadcast programs in a specified broadcast field during the prime time zone prescribed by Presidential Decree (hereinafter referred to as "prime time zone").

(4) A broadcasting business entity that engages in specialized programming shall program the broadcast programs in compliance with the standards prescribed by Presidential Decree, in order to sufficiently reflect the principal broadcast fields for which he/she has obtained a license or approval, or has registered, in such broadcast programs.

(5) The scope and types of broadcast programs which can be programmed by a broadcasting business entity that engages in specialized programming in addition to the principal broadcast fields for which he/she has obtained a license or approval, or has registered, shall be prescribed by Presidential Decree. <Newly Inserted by Act No. 8060, Oct. 27, 2006>

(6) The Korean Broadcasting System, a broadcasting business entity licensed under the Special Act, a broadcasting business entity financed by the Foundation for Broadcast Culture established under the Foundation for Broadcast Culture Act, or a terrestrial broadcasting business entity who is not the one financed by a broadcasting business entity financed by the Foundation for Broadcast Culture, shall not program the production of a certain broadcasting business entity in excess of the ratio prescribed by Presidential Decree.

(7) The Korean Broadcasting System shall program viewer participation programs directly produced by viewers, as prescribed by Presidential Decree.

(8) Any broadcasting business entity shall broadcast using Korean sign language, closed caption subtitles, screen commentaries, etc. to assist persons with disabilities in viewing broadcasts (hereinafter referred to as "broadcasting for persons with disabilities"). In such cases, the Korea Communications Commission may wholly or partially subsidize expenses incurred by a broadcasting business entity in providing broadcasts for persons with disabilities or in supplying receivers to watch broadcasting for persons with disabilities from the Broadcasting Communications Development Fund under Article 24 of the Framework Act on Broadcasting Communications Development. <Amended by Act No. 10856, Jul. 14, 2011; Act No. 11710, Mar. 23, 2013; Act No. 12677, May 28, 2014; Act No. 13978, Feb. 3, 2016>

(9) The scope of broadcasting business entities that are obligated to provide broadcasts for persons with disabilities under paragraph (8), the types of broadcast programs to be broadcast for persons with disabilities, and matters necessary for the implementation thereof shall be prescribed by Presidential Decree. <Newly Inserted by Act No. 10856, Jul. 14, 2011>

(10) Any community radio broadcasting business entity shall arrange listener participation programs in at least the rate prescribed by Presidential Decree within 50/100 of the total broadcasting hours of each month. <Newly Inserted by Act No. 8060, Oct. 27, 2006>

(11) No community radio broadcasting business entity shall program the production of a certain community radio broadcasting business entity in excess of the ratio prescribed by Presidential Decree within 50/100 of the total broadcasting hours of each month. <Newly Inserted by Act No. 13580, Dec. 22, 2015>

**Article 89 (Viewers Evaluation Program)**

(1) A broadcasting business entity engaged in general programming or specialized programming of news reports shall converge the opinions of viewers on the broadcasting operation and broadcast programs of the relevant broadcasting business entity, and compile a viewers evaluation program in excess of 60 minutes per week.

(2) One viewer critic selected and appointed by the viewers' committee may appear in the viewers evaluation program in person, and make a statement of opinions.

(3) The government may, from the Fund for Broadcasting Communications Development under Article 24 of the Framework Act on Broadcasting Communications Development, support viewer critics with expenses for a smooth performance of their duties. <Amended by Act No. 8867, Feb. 29, 2008; Act No. 10165, Mar. 22, 2010; Act No. 11710, Mar. 23, 2013>

**ENFORCEMENT DECREE OF THE BROADCASTING ACT**

**Article 36 (Revenue Sources)**

"Revenues prescribed by Presidential Decree" in Article 56 of the Act means any of the following:

1. Broadcast advertising revenues;

2. Profits from the sale of broadcast programs;

3. Government subsidies under Article 54 (2) or 61 of the Act;
4. Revenues from sponsors;
5. Revenues through new media, such as satellite broadcasting;
6. Revenues from being entrusted with the signal transmission operations;
7. Bonds or loans;
8. Money carried forward from the preceding year;
9. Other revenues incidental to the broadcasting business.

**ACT ON BROADCAST ADVERTISING SALES AGENCIES, ETC.**

**Article 5 (Broadcast Advertising Sales Agencies)**
(1) No terrestrial broadcasting business entity, terrestrial broadcasting program provider, or general program provider (hereinafter referred to as "broadcasting business entity") shall air any broadcast advertisement other than broadcast advertisements entrusted by an advertising sales agency: Provided, That the foregoing shall not apply to broadcast advertisements specified by Presidential Decree.
(2) Notwithstanding the main sentence of paragraph (1), the Korean Broadcasting System established under the Broadcasting Act, a broadcasting business entity, the largest investor in which is the Foundation for Broadcast Culture established under the Foundation for Broadcast Culture Act, or the Korea Educational Broadcasting System established under the Korea Educational Broadcasting System Act may air broadcast advertisements entrusted only by the Korea Broadcast Advertising Corporation established under Article 24.

# Exhibit 1b
## (English and Korean)

**Seoul Southern District Court 2018 GaDan258344 Action Claiming Grant of Execution Clause. This copy is not different from the original copy submitted on November 20, 2018.**

# COMPLAINT

Plaintiffs:

    1. GENESIS BBQ

       64 Jungdae-ro, Songpa-gu, Seoul (Munjeong-dong)

       Co-representative Directors: GyeongJoo Yoon and HakJong Yoon

    2. HongGeun Yoon

    3. HyeWoong Yoon

       Address of Plaintiffs 2 and 3: 49 Seolgae-ro, Sujeong-gu, Seongnam-si, (Siheung-dong)

       Counsel for Plaintiffs

       SHIN & KIM

       100 Toegye-ro, Jung-gu, Seoul (State Tower Namsan, Hoehyeon-dong 2-ga)

       Attorneys-at-law: SangHyeok Im, JaeSeop Song, SeHee Bang, SangYoon Lee, and HaeGyun Kim

Defendants:

    1. Korean Broadcasting System

       13 Yeoigongwon-ro, Youngdeungpo-gu, Seoul (Yeoido-dong, KBS)

       President & CEO: SeungDong Yang

**Action claiming grant of execution clause**.

## TENOR OF CLAIM

The Plaintiffs seek the following decisions:

1.  With respect to Paragraph NO. 2 out of the Decision on the Case No. 2018GaHap20527 Preliminary Injunction for Prohibition of Broadcasting filed between Plaintiffs and Defendant, the Korean Broadcasting System, the court secretary, etc. of the Seoul Southern District Court shall grant execution clause to Plaintiffs for compulsory execution against Defendant within the bound of KRW 160,000,000 for Plaintiffs each.

2.  The litigation costs shall be borne by Defendants.

**Seoul Southern District Court 2018 GaDan258344 Action Claiming Grant of Execution Clause. This copy is not different from the original copy submitted on November 20, 2018.**

## CAUSE OF ACTION

1.   **Status of Parties**

Plaintiff, GENESIS BBQ, (hereinafter "Plaintiff Company") is a corporation founded around 1995 and it has run a chicken franchise business under the brand name, BBQ.

Plaintiff, HongGeun Yoon, the founder of Plaintiff Company, is the director who substantially operates it. Plaintiff, HyeWoong Yoon, Plaintiff HongGeun Yoon's son, joined BBDOTQ U.S. (hereinafter "BBQ U.S. Headquarters") located in New Jersey, U.S. around August 1, 2016 and has been engaging in establishing and operating the franchise stores of Plaintiff Company in the U.S.

Defendant, the Korean Broadcasting System is a broadcasting business operator that provides television broadcast over KBS 1 channel and radio broadcasting nationwide.

2.   **Decision of preliminary injunction between Plaintiffs and Defendant**

**Seoul Southern District Court 2018 GaDan258344 Action Claiming Grant of Execution Clause. This copy is not different from the original copy submitted on November 20, 2018.**

With the petition for preliminary injunction to prohibit broadcasting on November 15, 2018, the Seoul Southern District Court rendered a decision to partially accept the petition (hereinafter, "Decision of Preliminary Injunction") (Plaintiff's Exhibit No.1, Seoul Southern District Court Decision No.2018KaHap20527). In accordance with the Decision of Preliminary Injunction, following is the scope of broadcasting program whose broadcasting, replayed broadcasting, advertisement, sale and posting on the Internet are prohibited.

Broadcasting of the part "used huge amount of company money to support his children's overseas education" in □ the opening statement; the part from "sketch of the details of BBQ CEO YOON's children's overseas education expenses" to "confirmation of a contract for the luxury car his son has been riding. In the name of the BBQ U.S. Headquarters" in □ the reporter's statement; and the part "Creditor HyeWoong Yoon has been studying abroad since 2008, and a person working for the BBQ U.S. Headquarters (BBDOTQ U.S.) at that time took care of Creditor HyeWoong Yoon and GENESIS BBQ, the Creditor Company, has paid HyeWoong Yoon's overseas education expenses to the said person working at the BBQ U.S. Headquarters (BBDOTQ U.S.). Likewise, GENESIS BBQ, the Creditor Company, or the BBQ U.S. Headquarters (BBDOTQ U.S.) has illegally raised funds for Creditor HyeWoong Yoon's overseas education", without any introduction or explanation of the position of Plaintiffs about the foregoing reports.

Position of Plaintiffs needed to be reflected, etc. with respect to the suspicion that the Creditor Company, or the BBQ U.S. Headquarters (BBDOTQ U.S.) has illegally raised funds for Creditor HyeWoong Yoon's overseas education.

Plaintiffs explain by presenting a foreign currency remittance statement, that Plaintiffs HongGeun Yoon and HyeWoong Yoon regularly remitted to the informer's US Citibank account each month to pay for HyeWoong Yoon's overseas education.

Introduce part of the objective materials including the foreign currency remittance

Seoul Southern District Court 2018 GaDan258344 Action Claiming Grant of Execution Clause. This copy is not different from the original copy submitted on November 20, 2018.

> statement presented by Plaintiffs as explanatory materials along with their explanation as described in Paragraph A. above.

Furthermore, the Decision of Preliminary Injunction decided on indirect compulsory performance to the extent that Plaintiff shall pay each Plaintiff KRW 20,000,000 per violation of the Decision of Preliminary Injunction (hereinafter "Decision of Indirect Compulsory Performance").

In view of the above-said order and the reason thereof, when it comes to raising the suspicion that HyeWoong Yoon's overseas education cost was paid for with the money of Plaintiff Company or BBQ U.S. Headquarter, not also mentioning how there are substantial objective evidential materials that verify the fact that Plaintiffs HongGeun Yoon and HyeWoong Yoon used their own money to pay for the overseas education cost could cause Plaintiffs to suffer disadvantage in their reputation and credibility that could not be easily recovered. Therefore, the intent of Decision of Preliminary Injunction is that relevant content can only be reported if the relevant counterclaims by Plaintiffs are sufficiently reflected.

### 3. News reports that violate Decision of Preliminary Injunction

Despite this, through "KBS 9 o'clock News" that was aired at 21:00 on November 15, 2018, Defendant ran the opening statement and Reporter's Report without any change at all (hereinafter referred to as "Report of this Case") although it was ordered from Decision of this Case that the segments be reported in restricted manner. Those segments only mentioned that "Plaintiff Company claimed that Plaintiffs HongGeun Yoon and HyeWoong Yoon regularly remitted money each month to the informer's Citibank account, and they provided bank records showing transactions and wires" and also raised a suspicion of "could that really be true?" regarding this. In the end, there was absolutely no report of the fact that "**there are substantial objective evidential materials that verify** the fact that Plaintiffs HongGeun Yoon and HyeWoong Yoon used their own money to pay for the overseas education cost", and furthermore, there was not a single mention of the specific content of objective materials such as bank records showing transactions and wires, etc.

**Seoul Southern District Court 2018 GaDan258344 Action Claiming Grant of Execution Clause. This copy is not different from the original copy submitted on November 20, 2018.**

As reasons for partially accepting Plaintiff's request for preliminary injunction, the Decision of Preliminary Injunction mentions that i) there are objective evidential materials that verify that Plaintiffs HongGeun Yoon and HyeWoong's own money, and not Plaintiff Company or BBQ U.S. Headquarters' money, accounts for significant amount of Plaintiff HyeWoon Yoon's source of money for overseas education, ii) it is difficult to deem that Defendant notified Plaintiffs of the content of the pre-broadcasting script that was submitted to the court for the Decision of this Case (hereinafter "Script of this Case") and adequately provided opportunity to make clarifications or submit opinions regarding the content, and iii) there are no submissions of specific, objective evidences that could be the grounds for claiming that the money withdrawn from the bank account under the informer's name was all used for Plaintiff HyeWoong Yoon's overseas education. Then in accordance with the intention of the Decision of Preliminary Injunction, Defendant should have reported the news by more faithfully reflecting the point of view of Plaintiffs regarding funding Plaintiff HyeWoong Yoon's overseas education.

However, Defendant reported the news without any modifications or improvements to the content of the Script of this Case, which, as a result, led to absolutely no change in content of the Report of this Case compared to the initial Script of this Case that was prepared before the preliminary injunction decision. Therefore, there is no question that Report of this Case violates the Decision of Preliminary Injunction.

**4. Scope of Grant of Execution Clause**

Besides broadcasting Report of this Case through "KBS 9 o'clock News" on November 15, 2018, Defendant broadcasted the same content as Report of this Case through "KBS 12 o'clock News" that was aired at 06:00 on November 16, 2018. In addition, Defendant has published content of Report of this Case on Defendant's website four times as shown below (See Plaintiff's Exhibit Nos. 2 to 5, Each News Report).

Seoul Southern District Court 2018 GaDan258344 Action Claiming Grant of Execution Clause. This copy is not different from the original copy submitted on November 20, 2018.

**Suspicious American life of BBQ 'CEO's Children'**

2018.11.16.12:24:01



[Anchor] It was revealed that CEO HongGeun YOON who owns BBQ, a global franchise with more than 300 restaurants in 50 countries, used company money to support his children's cost of living abroad and studying in the USA.
BBQ, on the 9th of this month, filed a lawsuit and requested the court for preliminary injunction to prohibit the broadcast.

**Suspicious American life of BBQ 'CEO's Children'**

2018.11.16.09:40:03



[Anchor] It was revealed that CEO HongGeun YOON who owns BBQ, a global franchise with more than 300 restaurants in 50 countries, used company money to support his children's cost of living abroad and studying in the USA.
BBQ, on the 9th of this month, filed a lawsuit and requested the court for preliminary injunction to prohibit the broadcast.

**Suspicious American life of BBQ 'CEO's Children'**

2018.11.16.07:10:22



[Anchor] It was revealed that CEO HongGeun YOON who owns BBQ, a global franchise with more than 300 restaurants in 50 countries, used company money to support his children's cost of living abroad and studying in the USA.
BBQ, on the 9th of this month, filed a lawsuit and requested the court for preliminary injunction to prohibit the broadcast.

**[Persistent K] "CEO of BBQ", paid for expenses of his children studying abroad with corporate money**

**2018.11.15.21:01:25**



**[Anchor] 9 0'clock news tonight (November 15) first gives you report on the news related to suspicious American life**

**Seoul Southern District Court 2018 GaDan258344 Action Claiming Grant of Execution Clause. This copy is not different from the original copy submitted on November 20, 2018.**

> **of the family of the CEO of BBQ, Korea's widely-known**
>
> **legendary successful chicken franchise. BBQ, a global**
>
> **chicken franchise known to have over 300 stores across 50**
>
> **countries in the world…**

As such, Defendant has violated Decision of Preliminary Injunction a total of eight times. In accordance with the Decision of Indirect Compulsory Enforcement, Defendant shall pay KRW 160,000,000 (=KRW 20,000,000 x 8 times) to each Plaintiff, and Plaintiffs can be granted of execution clause within the abovementioned scope.

**5. Conclusion**

As mentioned above, Defendant has violated the Decision of Preliminary Injunction eight times by publishing and broadcasting Report of this Case, etc. In accordance with the Decision of Indirect Compulsory Enforcement, Defendant is held liable to pay KRW 160,000,000 to each Plaintiff. As such, Plaintiffs have filed the action of this case in order to be granted the execution clause in accordance with the Decision of Indirect Compulsory Enforcement. Therefore, we respectfully request your court to accept all the claims Plaintiffs have made.

Further details about the cause of action and exhibits will be submitted subsequently.

**Seoul Southern District Court 2018 GaDan258344 Action Claiming Grant of Execution Clause. This copy is not different from the original copy submitted on November 20, 2018.**

## Exhibits

- Plaintiff's Exhibit No. 1  Seoul      Southern      District      Court      Decision      No. 2018KaHap20527
- Plaintiff's Exhibit No. 2  News report published on November 15, 2018
- Plaintiff's Exhibit No. 3  News report published on November 16, 2018
- Plaintiff's Exhibit No. 4  News report published on November 16, 2018
- Plaintiff's Exhibit No. 5  News report published on November 16, 2018

## Attachments

1. Power of Attorney for Lawsuit
2. Designation Letter of Attorneys-at-Law
3. Corporate Registration Certificate (GENESIS BBQ)
4. Corporate Registration Certificate (Korean Broadcasting System)

November 20, 2018

Counsel for Plaintiffs

SHIN & KIM

Attorneys-at-law        SangHyeok Im

JaeSeop Song

SeHee Bang

SangYoon Lee

HaeGyun Kim

**To be submitted to the Seoul Southern District Court**

**Seoul Southern District Court 2018 GaDan258344 Action Claiming Grant of Execution Clause. This copy is not different from the original copy submitted on November 20, 2018.**

# Power of Attorney for Lawsuit

*[Translation omitted]*

**Seoul Southern District Court 2018 GaDan258344 Action Claiming Grant of Execution Clause. This copy is not different from the original copy submitted on November 20, 2018.**

## Designation Letter of Attorneys-at-Law

*[Translation omitted]*

**Seoul Southern District Court 2018 GaDan258344 Action Claiming Grant of Execution Clause. This copy is not different from the original copy submitted on November 20, 2018.**

# Corporate Registration Certificate

## (GENESIS BBQ)

*[Translation omitted]*

**Seoul Southern District Court 2018 GaDan258344 Action Claiming Grant of Execution Clause. This copy is not different from the original copy submitted on November 20, 2018.**

# Corporate Registration Certificate

## (Korean Broadcasting System)

*[Translation omitted]*

**Seoul Southern District Court 2018 GaDan258344 Action Claiming Grant of Execution Clause. This copy is not different from the original copy submitted on November 20, 2018.**

**Plaintiff's Exhibit No. 1**

# Seoul Southern District Court
## 51ˢᵗ Civil Division

# DECISION

Case            2018KaHap20527 Preliminary Injunction for Prohibition of Broadcast

Creditors

    1.  GENESIS BBQ

       64 Jungdae-ro, Songpa-gu, Seoul (Munjeong-dong)

       Co-representative Directors: GyeongJoo Yoon and HakJong Yoon

    2.  HongGeun Yoon

    3.  HyeWoong Yoon

       Address of Creditors 2 and 3: 49 Seolgae-ro, Sujeong-gu, Seongnam-si, (Siheung-dong)

       Counsel for Creditors

       SHIN & KIM

       Attorneys-at-law:  SangHyeok  Im,  JaeSeop  Song,  SeHee  Bang, SangYoon Lee

Debtor

       Korean Broadcasting System

       13 Yeoigongwon-ro, Youngdeungdo-gu, Seoul (Yeoido-dong)

       President & CEO: SeungDong Yang

       Counsel for Debtor: Attorney-at-law JaeEun Shin

## Order

1.  The Debtor shall not broadcast any program specified in the List of Quotations in Appendix 1 through its programs, such as "*KBS 9 o'clock News*" which is broadcast at 21:00 every day, and shall not re-broadcast, advertise, sell any broadcast program dealing with such contents, or post it on any website, etc.
2.  If the Debtor fails to comply with the order specified in Paragraph 1, the Debtor shall pay each Creditor KRW 20,000,000 per violation.

Seoul Southern District Court 2018 GaDan258344 Action Claiming Grant of Execution Clause. This copy is not different from the original copy submitted on November 20, 2018.

3. Each of the other requests filed by the Creditors shall be dismissed.
4. Three-quarters (3/4) of the litigation costs shall be borne by the Creditors, and the rest of the costs, by the Debtor.

## TENOR OF REQUEST

(1) The Debtor shall not broadcast, re-broadcast, advertise, or sell any program including the contents specified in the List of Requests in Appendix 2 through its programs, such as "KBS News" which is broadcast at 21:00 every day (hereinafter referred to as "Broadcast of this Case), or post it on any website, etc.

(2) If the Debtor fails to comply with the order specified in Paragraph 1, the Debtor shall pay each Creditor KRW 1 billion per violation.

## GROUNDS

1. **Parts with respect to which the Creditors' request has been partially accepted**

A. Regarding the part "used huge amount of company money to support his children's overseas education" in □ the opening statement in Paragraph 1 of the List of Requests in Appendix 2; the part from "sketch of the details of BBQ CEO YOON's children's overseas education expenses" to "confirmation of a contract for the luxury car his son has been riding. In the name of the BBQ U.S. Headquarters" in □ the reporter's statement in Paragraph 1 in Appendix 2; and the part "Creditor HyeWoong Yoon has been studying abroad since 2008, and a person working for the BBQ U.S. Headquarters (BBDOTQ U.S.) at that time took care of Creditor HyeWoong Yoon and GENESIS BBQ, the Creditor Company, has paid HyeWoong Yoon's overseas education expenses to the said person working at the BBQ U.S. Headquarters (BBDOTQ U.S.). Likewise, GENESIS BBQ, the Creditor Company, or the BBQ U.S. Headquarters (BBDOTQ U.S.) has illegally raised funds for Creditor HyeWoong Yoon's overseas education" in Paragraph 3 in Appendix 2,

1) The following facts are substantiated based on the records of this Case and the purport of the overall hearing.

a) Because a considerable part of the suspicions the Debtor raises about the aforementioned parts in Paragraphs 1 and 2 of the List of Requests in Appendix 2 are mainly based on the informer's statement, the credibility of the informer's statement and materials the informer has submitted have significant effects on a judgment on the

**Seoul Southern District Court 2018 GaDan258344 Action Claiming Grant of Execution Clause. This copy is not different from the original copy submitted on November 20, 2018.**

authenticity of the suspicions. Having worked for BBDOTQ U.S. (BBDOTQ; hereinafter referred to as the "BBQ U.S. Headquarters") and helped HyeWoong Yoon study abroad, the informer seems to be in a position to know well about the sources, etc. of Creditor HyeWoong Yoon's overseas education expenses. Also, there is CEO YOON's approval signature on 'expected monthly expenditures for Mr. Yoon and Ms. Yoon, who are CEO YOON's son and daughter (Debtor's Exhibit No. 1),' and there are explanatory materials that appear to have been signed by Creditor HongGeun Yoon (See Debtor's Exhibit No. 2 Appraisal Report), such as '1. Report by department chief OOO US$ 10,000 (6,000), US$ 7,000 (4,000) in handwriting, 'implemented, starting from February and March (signature)', 'OK', and 'company expenses.' In addition, money (PPD ID: 2943345425) deposited in a JPMorgan Chase bank account in the informer's name seems to have been paid by the BBQ U.S. Headquarters.

b) However, according to materials submitted by the Creditors (details of each bank record showing transactions and wires in Creditors' Exhibits No. 18 through 29, Exhibits No. 40 through 43, and Exhibit No. 54), money of about US$ 4,000 to 10,000 has been regularly remitted from an account in the name of Creditors HongGeun Yoon and HyeWoong Yoon to the informer's Citibank account each month from around January 2011 to around June 2016. Since July 2016, money of over US$ 10,000 has been regularly remitted from an account in the name of Creditor HyeWoong Yoon to another account of Creditor HyeWoong Yoon each month. In addition, it is confirmed that Creditor HyeWoong Yoon's school expenses have been directly remitted to the school account.

c) Furthermore, considering how and when the Debtor interviewed the Creditors, the details of questions and answers, and the fact that the Creditors were not well aware of the contents of the broadcast until they requested the preliminary injunction, it seems that the Debtor visited the Creditors at its will to cover the case or the Creditors who came to know about the broadcast afterwards visited the Debtor. Moreover, while informing the Creditors of the suspicions raised based on the informer's argument, it is hardly deemed that the Debtor gave the Creditors a chance to explain the circumstances or state their opinions. For this reason, there is probability that the Debtor did not fully understand the sources of the fund for overseas education including school expenses which were regularly remitted overseas from an account in the name of HongGeun Yoon and HyeWoong Yoon to the informer's Citibank account, etc. since the account

**Seoul Southern District Court 2018 GaDan258344 Action Claiming Grant of Execution Clause. This copy is not different from the original copy submitted on November 20, 2018.**

was submitted by the Creditors after having requested the preliminary injunction.

d) On the other hand, unless under any special circumstances, such as where the money regularly remitted from the account in the name of HongGeun Yoon and HyeWoong Yoon to the informer's Citibank account was not used for Creditor HyeWoong Yoon's overseas education and instead hidden and used for other purposes and thus, the money the BBQ U.S. Headquarters paid to the informer as the informer's salary was used as Creditor HyeWoong Yoon's overseas education expenses, or where money remitted as above is not enough to pay for Creditor HyeWoong Yoon's overseas education and thus, even the money the BBQ U.S. Headquarters paid to the informer as the informer's salary was mostly used as Creditor HyeWoong Yoon's overseas education expenses, the money remitted abroad from the account in the name of HongGeun Yoon and HyeWoong Yoon to the informer's Citibank account, etc. seems to have been used as Creditor HyeWoong Yoon's overseas education expenses. In addition, no specific or objective evidence has been submitted which supports the use of money withdrawn from the JPMorgan Chase bank account in the informer's name as Creditor HyeWoong Yoon's overseas education expenses.

2) The following circumstances are found from the substantiated facts stated above: ① The sources of a considerable amount of overseas education expenses, including money regularly remitted to the informer's US Citibank account each month, have been verified based on objective evidential materials; ② On the other hand, no materials explaining where the money withdrawn from the informer's JPMorgan Chase bank account was used have been sufficiently verified or submitted, except for the informer's statement, although the informer seems to have stated that Creditor HyeWoong Yoon's overseas education expenses came from such bank account. Considering the foregoing, it is highly likely that unless under otherwise extenuating circumstances, at least the portion equivalent to the amount of money Creditors HongGeun Yoon and HyeWoong Yoon regularly remitted to the informer's US Citibank account each month, out of the sources of Creditor HyeWoong Yoon's overseas education expenses which are revealed in 'expected monthly expenditures for Mr. Yoon and Ms. Yoon (Debtor's Exhibit No. 1),' was covered by the money of Creditors HongGeun Yoon and HyeWoong Yoon, not by that of the Creditor GENESIS BBQ, (hereinafter referred to as "Creditor Company"), or the BBQ U.S. Headquarters, as the Creditors argue.

3) If, without mentioning that overseas education expenses covered by Creditors

Seoul Southern District Court 2018 GaDan258344 Action Claiming Grant of Execution Clause. This copy is not different from the original copy submitted on November 20, 2018.

HongGeun Yoon and HyeWoong Yoon's money have been verified based on objective evidentiary materials, the Debtor broadcasts the contents of the Broadcast of this Case as they are, raising the suspicion that money of the Creditor Company or the BBQ U.S. Headquarters was used to pay for Creditor HyeWoong Yoon's overseas education, as stated in the part "used huge amount of company money to support his children's overseas education" in □ the opening statement in Paragraph 1 of the List of Requests in Appendix 2; the part from "sketch of the details of BBQ CEO YOON's children's overseas education expenses" to "confirmation of a contract for the luxury car his son has been riding; and the part "Creditor HyeWoong Yoon has been studying abroad since 2008, and a person working for the BBQ U.S. Headquarters at that time took care of Creditor HyeWoong Yoon and the Creditor Company has paid HyeWoong Yoon's overseas education expenses to the said person working at the BBQ U.S. Headquarters. Like this, the Creditor Company or the BBQ U.S. Headquarters has illegally raised funds for Creditor HyeWoong Yoon's overseas education" in Paragraph 3 in Appendix 2, then the Creditors are likely to eventually suffer damage to their honor and credit that cannot be easily recovered. Hence, the right to be protected and the need for such protection are substantiated for the part seeking for prohibition of broadcast, etc. of the contents specified in the List of Quotations in Appendix 1, in relation to each of the aforementioned broadcast contents, among requests filed by the Creditors.

B.  Regarding the request for indirect compulsory request

Notwithstanding the decision on the preliminary injunction, the probability that the Debtor may violate the order issued under Paragraph 1 of the Order cannot be ruled out. Therefore, to guarantee the effectiveness of the decision on the preliminary injunction, an order for indirect compulsory performance shall be issued, and the amount of indirect compulsory performance shall be determined as specified in Paragraph 2 of the Order, in consideration of various circumstances identified in the records of this Case and the purport of the overall examination, such as circumstances that led the Creditors to file a request for preliminary injunction, the Debtor's attitudes, and the possibility of violations.

**2.  Parts with respect to which the Creditors' request has not been accepted**

**Seoul Southern District Court 2018 GaDan258344 Action Claiming Grant of Execution Clause. This copy is not different from the original copy submitted on November 20, 2018.**

A.  Regarding the part "Creditor HyeWoong Yoon unfairly received an investment in the process of acquiring E2 visa in New Jersey, the U.S.A. around 2016" in Paragraph 2 of the List of Requests in Appendix 2,

According to the broadcast script submitted by the Debtor (See the preparatory document dated November 14, 2018 and Paragraph 1 of the List of Requests in Appendix 2), the content that Creditor HyeWoong Yoon unfairly received an investment in the process of acquiring E2 visa in New Jersey, the U.S.A. around 2016 does not fall under the contents the Debtor intends to broadcast through the Broadcast of this Case. Therefore, because the right to preservative measures and the need for preservation are not substantiated for the Creditors' request for prohibition of broadcast, etc. of such part, their request shall not be accepted.

B.  Regarding the remaining part of the List of Requests in Appendix 2; the part "Creditor HyeWoong Yoon explained his position and duties as a 'full-time director' while applying for E2 visa, but he did not actually work at the BBQ U.S. Headquarters. Even if he did, he stayed in locations outside New Jersey, such as Boston and Manhattan, which constitutes a violation of the Immigration Law. So, he violated immigration law" in Paragraph 2 of the List of Requests in Appendix 2; and the part "Creditor HyeWoong Yoon received about US$6,000 from the BBQ U.S. Headquarters each month from August 1, 2016 to July 31, 2017, and this was actually paid for overseas education" in Paragraph 3 in Appendix 2,

Considering diverse circumstances found in the records of this Case and the purport of the overall examination, such as the Debtor's purpose and contents of the Broadcast of this Case, the manner in which the broadcast is prepared, contents of suspicions raised by the Debtor, the contents and extent of evidentiary materials the Debtor has collected on its own, Creditor HyeWoong Yoon's academic background, career, capacity and major, the post and degree of the pay for which Creditor HyeWoong Yoon concluded a labor contract with the BBQ U.S. Headquarters, and the physical distance from the location of the BBQ U.S. Headquarters to the location of the school Creditor HyeWoong Yoon   is attending, the remaining part of Paragraph 1 of the List of

**Seoul Southern District Court 2018 GaDan258344 Action Claiming Grant of Execution Clause. This copy is not different from the original copy submitted on November 20, 2018.**

Requests in Appendix 2; the part "Creditor HyeWoong Yoon explained his position and duties as a 'full-time director' while applying for E2 visa, but he did not actually work in the BBQ U.S. Headquarters. Even if he did, he stayed in locations outside New Jersey, such as Boston and Manhattan, which constitutes a violation of the Immigration Law (including the meaning that he may have violated the immigration law)" in Paragraph 2 of the List of Requests in Appendix 2; and the part "Creditor HyeWoong Yoon received about US$6,000 from the BBQ U.S. Headquarters each month from August 1, 2016 to July 31, 2017, and this was actually paid for overseas education" in Paragraph 3 in Appendix 2, in the Broadcast of this Case, seem to be within the scope of reasonable suspicions to be raised with substantial grounds, when only the materials the Creditors have submitted are examined. Moreover, it is hard to regard the contents expressed as false or to view the purpose of the contents, which are related to the public interests, as not exclusively for the public interests. For such reasons, the Creditors' request for prohibition of broadcast, etc. of these parts shall not be accepted because the right to preservative measures has not been fully substantiated.

### 3. Conclusion

The Court decides as set forth in the Order hereof, accepting the Creditors' requests within the aforementioned scope of recognition as they have grounds and dismissing each of the other requests as it is without merit.

November 15, 2018

President Judge          Judge   DoHyeong Kim

                        Judge   KangMin Park

                        Judge   SeungJun Paek

Appendix 1

**Seoul Southern District Court 2018 GaDan258344 Action Claiming Grant of Execution Clause. This copy is not different from the original copy submitted on November 20, 2018.**

List of Quotations

Broadcasting the part "used huge amount of company money to support his children's overseas education in □ the opening statement in Paragraph 1 of the List of Requests in Appendix 2 and the part from "sketch of the details of BBQ CEO YOON's children's overseas education expenses" to "confirmation of a contract for the luxury car his son has been riding. In the name of the BBQ U.S. Headquarters" in □ the reporter's statement in Paragraph 1 in Appendix 2; or broadcasting the statement that "Creditor HyeWoong Yoon has been studying abroad since 2008, and a person working for the BBQ U.S. Headquarters at that time took care of Creditor HyeWoong Yoon and the Creditor Company has paid HyeWoong Yoon's overseas education expenses to the said person working at the BBQ U.S. Headquarters. Like this, the Creditor Company or the BBQ U.S. Headquarters has illegally raised funds for Creditor HyeWoong Yoon's overseas education," without introducing or reflecting the following position or explanation of the Creditors:

---

○ **The Creditors' position, etc. that need to be reflected in connection with the suspicion that money of the Creditor Company or the BBQ U.S. Headquarters was used to pay for Creditor HyeWoong Yoon's overseas education**

(a) Presenting bank records, etc. showing transactions and wires, the Creditors explain that Creditors HongGeun Yoon and HyeWoong Yoon paid for Creditor HyeWoong Yoon's overseas education by regularly remitting money to the informer's Citibank account each month.

(b) Some of the objective materials, including bank records, etc. showing transactions and wires the Creditors have presented as explanatory materials, are introduced along with the contents of the explanation provided by the Creditors in Paragraph (a) above.

---

**Seoul Southern District Court 2018 GaDan258344 Action Claiming Grant of Execution Clause. This copy is not different from the original copy submitted on November 20, 2018.**

Appendix 2

List of Requests

1. The content of the broadcasting script (temporarily) titled, "Suspicious American life of BBQ CEO's Children" submitted by the Debtor as below.

   ☐ Opening Remarks
   We received a tip last September.
   A self-made man at a medium-sized company paid for his children's overseas education using his company's money.
   Persistent K checks out this tip about Mr. HongGeun YOON, the CEO of BBQ, Korea's legendary successful chicken franchise…

   ☐ Reporter's Report
   Sketch of the details of BBQ CEO YOON's children's overseas education expenses…
   It listed monthly living cost was $17,000, which is equivalent to KRW 20 million.
   It says that the money was paid from a corporate worker in U.S BBQ headquarters.
   The signature which is said to be CEO YOON's signature was analyzed by comparing it with his signature on other document.

   <Interview with the Signature Expert>
   "High Probability of Same Signature…"

   The reporter flew to the U.S. to meet the informer.
   Met the informer, who has been responsible for Mr. Yoon in the U.S. since he has been in elementary school.
   Visited the house where the informer has lived with the son of CEO YOON for two years… The rent was KRW 5.5 per month.
   Confirmed the agreement of the luxury cars he has been riding.
   It is registered as corporate cars of BBQ in New Jersey.

   <Interview with the Informer>
   "It's illegal and immoral. I was aware of this, but I had to choose this path because I had to survive as well.

   Contact Harvard University where he is said to get admitted to.
   It is not an undergraduate school but the Harvard Extension school which is equivalent to a life-long education center. The school does not provide student visas.

   <Interview with Harvard School Staff>
     "You don't sponsor F-1 visas, the student visas?"
       "No. Not during the academic year"

   Sketch of visa documents of Mr. Yoon

**Seoul Southern District Court 2018 GaDan258344 Action Claiming Grant of Execution Clause. This copy is not different from the original copy submitted on November 20, 2018.**

He applied for a business E2 Visa
A full-time director for BBQ U.S.A with a salary of $60,000.
The company requested for this visa claiming that Mr. Yoon was a necessary employee for the company.
WE went to the headquarters of BBQ U.S.A in New Jersey where he is registered as a full-time director.

< Tape-recording of U.S. Headquarters Employee>
"How many employees are there? Are there many expats?"
"One expat." "The others are local employees."

In the middle of the reporting in the U.S., BBQ staff visited KBS in Seoul to repute the report.

<Tape-recording of BBQ Employee>

"Manager of the store directly operated by the company, chef.
I am in charge of the management of the store."

<Interview with a Lawyer Specialized in Immigration in the U.S.>
"If the company is located in New Jersey and an employee is living in Boston, five hours away by drive, it sounds weird. There is possibility of violation of the Immigration Law.

Reported the Boston Store to make a confirmation.
The store opened on July 7, 2016 (two months before Mr. Yoon was admitted to the Harvard Extension school).
We waited for half a day and then came back the next day, with no avail. We couldn't find him around.
Called him on the phone for a confirmation.

"I am a reporter of KBS. You don't come to work. Why are you staying in Boston when you received your visa as an employee in New Jersey?"
"Let me give you the answer properly later time."

BBQ's Explanation…
1. CEO YOON or his son pays for the school, living and other expenses incurred by his living and studying abroad
2. Some of the employees of the store may not know Mr. Yoon because of the nature of his work.
3. Other employees who said they don't know Mr. Yoon were following company protocol.
4. Mr. Yoon can work remotely without compromising his responsibilities and affecting the company.
5. It is deemed that he is faithfully performing his job as the store is making good profits.

In order to give the right to refute to CEO YOON, we tried to have an interview with him on his way to work in the morning of November 7.

"Let me ask a question about your son?"

**Seoul Southern District Court 2018 GaDan258344 Action Claiming Grant of Execution Clause. This copy is not different from the original copy submitted on November 20, 2018.**

"…"
"Did you pay for his living and school with the company money? Answer me, please."
He seems running away, pushing the camera away.

Closing.

2. Creditor, HyeWoong Yoon acquired E2 visa in New Jersey, the U.S., around 2016, receiving investment in an unlawful manner during the course. Creditor, HyeWoong Yoon applied for the visa, explaining that he is in the capacity of a full-time director. But he didn't work at the U.S. corporation of BBQ and even if he did, he stayed in locations outside New Jersey, such as Boston and Manhattan, which constitutes a violation of the Immigration Law.

3. Creditor, HyeWoong Yoon was paid approximately USD 6,000 every month by the U.S. corporation of BBQ from August 1, 2016 to July 31, 2017 which in fact seems to have been used to pay for his living and school expenses.   Creditor HyeWoong Yoon has been studying abroad since 2008, and a person working for the BBQ U.S. Headquarters (BBDOTQ U.S.) at that time took care of Creditor HyeWoong Yoon and the Creditor Company, has paid HyeWoong Yoon's overseas education expenses through the said person working at the BBQ U.S. Headquarters (BBDOTQ U.S.). Likewise, the Creditor Company or the BBQ U.S. Headquarters has illegally raised funds for Creditor HyeWoong Yoon's overseas education

EOD.

Seoul Southern District Court 2018 GaDan258344 Action Claiming Grant of Execution Clause. This copy is not different from the original copy submitted on November 20, 2018.

## This is an authentic copy.

November 15, 2018

## Seoul Southern District Court

Administrative Clerk Si-Il Kim (sealed)

---

※ You can check whether the document has been altered or not by using the issue number search menu of the computer installed in each court room for the purpose of case searches or by inquiring the court in charge about the issue number shown at the bottom of this document.

**Seoul Southern District Court 2018 GaDan258344 Action Claiming Grant of Execution Clause. This copy is not different from the original copy submitted on November 20, 2018.**

**Plaintiff's Exhibit No. 2**

**KBS NEWS**

[Persistent K] "BBQ CEO, Used Company Money to Pay for Children's Overseas

Published at 21:01 on November 15, 2018
Revised at 10:21 on November 16, 2018
News 9



*Anchor*
Today (15th)'s first news report is about the suspicious American life of a very well-known CEO of a chicken franchise.
It was revealed that CEO HongGeun YOON who owns BBQ, a global franchise with more than 300 restaurants in 50 countries, used company money to support his children's cost of living abroad and studying in the USA.
KBS confirmed facts through persistent investigation and data verification, but BBQ, on the 9th of this month, filed a lawsuit and requested the court for temporary restraining order to restrict the broadcast. However, the court has dismissed most of these requests from BBQ.
This was reported by SeYeon Lee [Persistent K], introducing the 9 o'clock news.

*Reporter*
We received a tip last September.
A self-made man at a medium-sized company paid for his children's overseas education using his company's money.
Persistent K checks out this tip about Mr. HongGeun **YOON**, the CEO of BBQ, Korea's legendary successful chicken franchise.
We received one piece of paper.
'CEO **YOON**'s son, Mr. Yoon, monthly expenditures'

**Seoul Southern District Court 2018 GaDan258344 Action Claiming Grant of Execution Clause. This copy is not different from the original copy submitted on November 20, 2018.**

Mr. Yoon is CEO HongGeun **YOON**'s son and Ms. Yoon is CEO HongGeun **YOON**'s daughter.
It listed monthly living cost was $17,000 and was paid from a corporate worker in U.S.A's BBQ headquarters.
The signature for approval is said to be CEO **YOON**'s signature.
Is this a credible tip?
Persistent K got access to company file and compared the signatures.

***Ms. Eun Young Kim/Signature Expert***
"High Probability of Same Signature"

***Reporter***
Met informer, the one who sent us the tip, in the U.S., the whistleblower has been responsible for Mr. Yoon in the U.S. since he has been in elementary school.

***Informer (voice distorted)***
"His grades wouldn't improve despite his continued education overseas in the U.S. But (the CEO) kept saying that his son needed to be accepted to Harvard…"

***Reporter***
He was responsible for transportation to and from private school, academics, physical health, and meals while living in the same house.

***Informer (voice distorted)***
"I talked on the phone with the CEO everyday. He asked how his son was doing, how his daughter was doing, what they ate, and what kind of exercise they did. There was rarely any company work as an employee.
"The house all the way on the left. The master bedroom was always empty and reserved for (voice distorted) and the CEO."

***Reporter***
They have lived in 5 different houses together.
The house Mr. Yoon lived in for 2 years cost $4,700 a month for rent. The rent was paid for by the company's money.
Mr. Yoon has been seen riding luxury cars since high school, including those from Benz and Audi. Upon checking, these cars were registered as corporate cars of BBQ in New Jersey.

***Neighbor from the past***
He drove a car with a New Jersey plate, but I'd only see it from time to time.

***Reporter***
The informer showed us the content of the living expenses, including pet fees, costs for amusement parks, sports games, and most shockingly, the cost of tutors.

***Informer (voice distorted)***
"Fees for tutors would cost $7,000 to $9,000 a month."

***Reporter***

**Seoul Southern District Court 2018 GaDan258344 Action Claiming Grant of Execution Clause. This copy is not different from the original copy submitted on November 20, 2018.**

In 2009, Ms. Yoon came to the U.S. as well. The informers' wife was recruited and registered as a fake employee to pay for the living expenses. The informer reported that he received wage compensation through a different Korean account.

### Informer (voice distorted)
"It's illegal and immoral. I was aware of this, but I had to choose this path because I had to survive as well.

### Reporter
Over 1 million dollars of the company's money has been spent over the past 8 years.
It's now time to find Mr. Yoon himself.
We went to the last house he was told to have resided in Boston

### Current Resident
"(Does Yoon (voice distorted) live in Room 201?) No, I am currently living in 201. It's been over a year and half since I've moved here."

### Reporter
Mr. Yoon posted on his Facebook that he was enrolled at Harvard University, so we went to visit the university.
Upon further investigation, the school Mr. Yoon was enrolled in was the Harvard Extension school.
This school does not provide student visas to their students.

### Harvard School Staff
"(You don't sponsor F-1 visas, the student visas?) No. Not during the academic year"

### Reporter
How is the Mr. Yoon residing in the U.S. without a student visa?
This is the file Persistent K was able to find about Mr. Yoon's visa.
He applied for a business E2 Visa by registering himself as a full-time director for BBQ U.S.A with a salary of $60,000.
The company requested for this visa claiming that Mr. Yoon, who had just graduated from high school, was a necessary employee for the company

### Informer (voice distorted)
I saw him getting paid for 3-4 months by the time I had quit my job.

### Reporter
Is Mr. Yoon working?
We went to the headquarters of BBQ U.S.A in New Jersey early in the morning.
"They're walking in through an unlocked door?"
Mr. Yoon was nowhere to be seen despite other employees going to work.

### U.S. Headquarters Employee
"He goes to Boston and takes care of management, but on a flexible schedule."

### Reporter
Will we be able to meet the son at the one of the franchise shops?

**Seoul Southern District Court 2018 GaDan258344 Action Claiming Grant of Execution Clause. This copy is not different from the original copy submitted on November 20, 2018.**

The BBQ franchise in Boston opened in 2016, 2 months before Mr. Yoon began studying at Harvard.

***Employee (voice distorted)***
"(Are all of the employees here Korean?) Yes."
"(SeYeon, what time is it?) 4:39"

***Reporter***
We were unable to see Mr. Yoon despite waiting for hours.

***Employee (voice distorted)***
"(Do you think you can tell us when he came to the store?) I'm not sure. I haven't seen him. I'm not sure who he is… (You don't know Yoon?) Yes. I've heard about him though…"

***Reporter***
We went to the store again the next day.

***Employee (Voice distorted)***
"(Hello. Is Yoon there?) He's not here. (He doesn't work there?) No, he doesn't."

***Reporter***
Even the employees do not know of Mr. Yoon's whereabouts.
All we were able to obtain is his phone number.

***[ Phone call ]***
***CEO HongGeun YOON's Son (Voice distorted)***
"Hello"
"(Is this Yoon?) Yes."
"(We continued to visit the Boston branch, but we saw that you haven't been going into work.) I'm not going to work? This is ridiculous. I have been going to work."
"(You're in Boston, right?) Yes, I'm in Boston."
"(Why are you in Boston when you received a visa as an employee in New Jersey?) I will clearly explain this to you later."

***Reporter***
BBQ gave an explanation to Persistent K's investigation. CEO **YOON** and Mr. Yoon provided bank records showing transactions and wires for the costs of his children's overseas education to informer's Citibank account. Also, the company explained that some of the employees may not know Mr. Yoon and revealed that other employees who said they don't know Mr. Yoon were following company protocol. Also, the company said that Mr. Yoon can work remotely without compromising his responsibilities and affecting the company.
Is this the truth?
We asked CEO **YOON** himself.

"Hello, CEO **YOON**. My name is SeYeon Lee and I am a reporter for KBS. I want to ask about your son and whether you hired an employee to pay for your children's overseas education with money from your company? CEO **YOON**, please answer me."

Is the explanation given by BBQ true?

**Seoul Southern District Court 2018 GaDan258344 Action Claiming Grant of Execution Clause. This copy is not different from the original copy submitted on November 20, 2018.**

We will continue to reveal more details.

This was reporter SeYeon Lee of Persistent K.

**Seoul Southern District Court 2018 GaDan258344 Action Claiming Grant of Execution Clause. This copy is not different from the original copy submitted on November 20, 2018.**

**Plaintiff's Exhibit No. 3**

## KBS NEWS

"Suspicious American life of BBQ CEO **YOON**'s son"

Published at 07:10 on November 16, 2018
Revised at 07:56 on November 16, 2018
News Square



*Anchor*
It was revealed that CEO HongGeun YOON who owns a global franchise BBQ used company money to support his children's cost of living abroad and studying in the USA.

BBQ, on the 9th of this month, filed a lawsuit and requested the court for temporary restraining order to restrict the broadcast. However, the court has dismissed most of these requests from BBQ.

This was reported by SeYeon Lee

*Reporter*
We received one piece of paper.
'CEO **YOON**'s son, Mr. Yoon, monthly expenditures'
Mr. Yoon is CEO HongGeun **YOON**'s son and Ms. Yoon is CEO HongGeun **YOON**'s daughter.
It listed monthly living cost was $17,000 and was paid from a corporate worker in U.S.A's BBQ headquarters.
The signature for approval is said to be CEO **YOON**'s signature.

The whistleblower has been responsible for Mr. Yoon in the U.S. since he has been in elementary school.

**Seoul Southern District Court 2018 GaDan258344 Action Claiming Grant of Execution Clause. This copy is not different from the original copy submitted on November 20, 2018.**

### Informer (voice distorted)
"I talked on the phone with the CEO everyday. He asked how his son was doing, how his daughter was doing, what they ate, and what kind of exercise they did. There was rarely any company work as an employee.

### Reporter
Over 1 million dollars of the company's money has been spent over the past 8 years.
Mr. Yoon posted on his Facebook that he was enrolled at Harvard University, so we went to visit the university.
Upon further investigation, the school Mr. Yoon was enrolled in was the Harvard Extension school.

### Harvard School Staff
"(You don't sponsor F-1 visas, the student visas?) No. Not during the academic year"

### Reporter
How is the Mr. Yoon residing in the U.S. without a student visa?
This is the file Persistent K was able to find about Mr. Yoon's visa.
He applied for a business E2 Visa by registering himself as a full-time director for BBQ U.S.A with a salary of $60,000.
Is Mr. Yoon working?

### U.S. Headquarters Employee
"He goes to Boston and takes care of management, but on a flexible schedule."

### Reporter
The BBQ franchise in Boston opened in 2016, 2 months before Mr. Yoon began studying at Harvard.

Undercover Investigation Begins
We were unable to see Mr. Yoon despite waiting for hours.
BBQ gave an explanation that CEO **YOON** and Mr. Yoon provided bank records showing transactions and wires for the costs of his children's overseas education to informer's Citibank account. Also, the company said that Mr. Yoon can work remotely without compromising his responsibilities and affecting the company.
We asked CEO **YOON** himself.

["(Hello, CEO **YOON**. I want to ask about your son) …… (whether you hired an employee to pay for your children's overseas education with money from your company? CEO **YOON**, please answer me.)"]

Is the explanation given by BBQ true?
We will continue to reveal more details.
This was reporter SeYeon Lee of KBS News.

**Seoul Southern District Court 2018 GaDan258344 Action Claiming Grant of Execution Clause. This copy is not different from the original copy submitted on November 20, 2018.**

**Plaintiff's Exhibit No. 4**

**KBS NEWS**

"Suspicious American life of BBQ CEO **YOON**'s son"

Published at 09:40 on November 16, 2018
Revised at 10:13 on November 16, 2018
930 News



*Anchor*
It was revealed that CEO HongGeun YOON who owns a global franchise BBQ used company money to support his children's cost of living abroad and studying in the USA.

BBQ, on the 9th of this month, filed a lawsuit and requested the court for temporary restraining order to restrict the broadcast. However, the court has dismissed most of these requests from BBQ.

This was reported by SeYeon Lee

*Reporter*
We received one piece of paper.
'CEO **YOON**'s son, Mr. Yoon, monthly expenditures'
Mr. Yoon is CEO HongGeun **YOON**'s son and Ms. Yoon is CEO HongGeun **YOON**'s daughter.
It listed monthly living cost was $17,000 and was paid from a corporate worker in U.S.A's BBQ headquarters.
The signature for approval is said to be CEO **YOON**'s signature.

The whistleblower has been responsible for Mr. Yoon in the U.S. since he has been in elementary school.

**Seoul Southern District Court 2018 GaDan258344 Action Claiming Grant of Execution Clause. This copy is not different from the original copy submitted on November 20, 2018.**

*Informer (voice distorted)*
"I talked on the phone with the CEO everyday. He asked how his son was doing, how his daughter was doing, what they ate, and what kind of exercise they did. There was rarely any company work as an employee.

*Reporter*
Over 1 million dollars of the company's money has been spent over the past 8 years.
Mr. Yoon posted on his Facebook that he was enrolled at Harvard University, so we went to visit the university.
Upon further investigation, the school Mr. Yoon was enrolled in was the Harvard Extension school.

*Harvard School Staff*
"(You don't sponsor F-1 visas, the student visas?) No. Not during the academic year"

*Reporter*
How is the Mr. Yoon residing in the U.S. without a student visa?
This is the file Persistent K was able to find about Mr. Yoon's visa.
He applied for a business E2 Visa by registering himself as a full-time director for BBQ U.S.A with a salary of $60,000.
Is Mr. Yoon working?

*U.S. Headquarters Employee*
"He goes to Boston and takes care of management, but on a flexible schedule."

*Reporter*
The BBQ franchise in Boston opened in 2016, 2 months before Mr. Yoon began studying at Harvard.

Undercover Investigation Begins
We were unable to see Mr. Yoon despite waiting for hours.
BBQ gave an explanation that CEO **YOON** and Mr. Yoon provided bank records showing transactions and wires for the costs of his children's overseas education to informer's Citibank account. Also, the company said that Mr. Yoon can work remotely without compromising his responsibilities and affecting the company.
We asked CEO **YOON** himself.

["(Hello, CEO **YOON**. I want to ask about your son) …… (whether you hired an employee to pay for your children's overseas education with money from your company? CEO **YOON**, please answer me)."]

Is the explanation given by BBQ true?
We will continue to reveal more details.
This was reporter SeYeon Lee of KBS News.

**Seoul Southern District Court 2018 GaDan258344 Action Claiming Grant of Execution Clause. This copy is not different from the original copy submitted on November 20, 2018.**



SeYeon Lee Reporter say@kbs.co.kr

Seoul Southern District Court 2018 GaDan258344 Action Claiming Grant of Execution Clause. This copy is not different from the original copy submitted on November 20, 2018.

**Plaintiff's Exhibit No. 5**

**KBS NEWS**

"Suspicious American life of BBQ CEO **YOON**'s son"

Published at 12:24 on November 16, 2018
Revised at 12:36 on November 16, 2018
News 12



*Anchor*
It was revealed that CEO HongGeun YOON who owns a global franchise BBQ used company money to support his children's cost of living abroad and studying in the USA.

BBQ, on the 9th of this month, filed a lawsuit and requested the court for temporary restraining order to restrict the broadcast. However, the court has dismissed most of these requests from BBQ.

This was reported by SeYeon Lee

*Reporter*
We received one piece of paper.
'CEO **YOON**'s son, Mr. Yoon, monthly expenditures'
Mr. Yoon is CEO HongGeun **YOON**'s son and Ms. Yoon is CEO HongGeun **YOON**'s daughter.
It listed monthly living cost was $17,000 and was paid from a corporate worker in U.S.A's BBQ headquarters.
The signature for approval is said to be CEO **YOON**'s signature.

The whistleblower has been responsible for Mr. Yoon in the U.S. since he has been in elementary school.

**Seoul Southern District Court 2018 GaDan258344 Action Claiming Grant of Execution Clause. This copy is not different from the original copy submitted on November 20, 2018.**

*Informer (voice distorted)*
"I talked on the phone with the CEO everyday. He asked how his son was doing, how his daughter was doing, what they ate, and what kind of exercise they did. There was rarely any company work as an employee.

*Reporter*
Over 1 million dollars of the company's money has been spent over the past 8 years.
Mr. Yoon posted on his Facebook that he was enrolled at Harvard University, so we went to visit the university.
Upon further investigation, the school Mr. Yoon was enrolled in was the Harvard Extension school.

*Harvard School Staff*
"(You don't sponsor F-1 visas, the student visas?) No. Not during the academic year"

*Reporter*
How is the Mr. Yoon residing in the U.S. without a student visa?
This is the file Persistent K was able to find about Mr. Yoon's visa.
He applied for a business E2 Visa by registering himself as a full-time director for BBQ U.S.A with a salary of $60,000.
Is Mr. Yoon working?

*U.S. Headquarters Employee*
"He goes to Boston and takes care of management, but on a flexible schedule."

*Reporter*
The BBQ franchise in Boston opened in 2016, 2 months before Mr. Yoon began studying at Harvard.

Undercover Investigation Begins
We were unable to see Mr. Yoon despite waiting for hours.
BBQ gave an explanation that CEO **YOON** and Mr. Yoon provided bank records showing transactions and wires for the costs of his children's overseas education to informer's Citibank account. Also, the company said that Mr. Yoon can work remotely without compromising his responsibilities and affecting the company.
We asked CEO **YOON** himself.

["(Hello, CEO **YOON**. I want to ask about your son) …… (whether you hired an employee to pay for your children's overseas education with money from your company? CEO **YOON**, please answer me).")

Is the explanation given by BBQ true?
We will continue to reveal more details.
This was reporter SeYeon Lee of KBS News.

**Seoul Southern District Court 2018 GaDan258344 Action Claiming Grant of Execution Clause. This copy is not different from the original copy submitted on November 20, 2018.**



SeYeon Lee Reporter say@kbs.co.kr

서울남부지법 2018가합113738 정정보도등 청구의 소 2018.11.20 제출 원본과 상위 없음




# 서 울 남 부 지 방 법 원

## 제 5 1 민 사 부

## 결        정

사    건        2018카합20527  방송금지 가처분

채 권 자        1. 주식회사 제너시스비비큐

　　　　　　　　　서울 송파구 중대로 64(문정동)

　　　　　　　　　공동대표이사 윤경주, 윤학종

　　　　　　　2. 윤홍근

　　　　　　　3. 윤혜웅

　　　　　　　　　채권자 2, 3의 주소  성남시 수정구 설개로 49(시흥동)

　　　　　　　채권자들 소송대리인 법무법인 세종

　　　　　　　　　　　　　　　　담당변호사 임상혁, 송재섭, 방세희, 이상윤

채 무 자        한국방송공사

　　　　　　　서울 영등포구 여의공원로 13(여의도동)

　　　　　　　대표자 사장 양승동

　　　　　　　소송대리인 변호사 신재은

## 주        문

1. 채무자는 별지 1. 인용목록 기재 프로그램을 매일 21:00 방송되는 'KBS 뉴스 9' 등

갑 제7호증

Case 1:19-cv-10278-PBS  Document 6-1  Filed 05/13/19  Page 60 of 71




의 프로그램으로 방송하거나 그러한 내용의 방송 프로그램을 재방송, 광고, 판매하

거나 인터넷 등에 게시하여서는 아니 된다.

2. 채무자가 제1항 기재 명령을 위반할 경우 채무자는 각 채권자에게 위반행위 1회당

20,000,000원씩을 지급하라.

3. 채권자들의 각 나머지 신청을 모두 기각한다.

4. 소송비용 중 4분의 3은 채권자들이, 나머지는 채무자가 각 부담한다.


## 신 청 취 지

(1) 채무자는 별지 2. 신청목록 기재 내용을 포함한 프로그램을 매일 21:00에 방송되는

'KBS뉴스' 등의 프로그램(이하 '이 사건 방송'이라고 한다)으로 방송, 재방송, 광고, 판

매하거나 인터넷 등에 게시하여서는 아니 된다. (2) 채무자가 제1항 기재 명령을 위반

할 경우 채무자는 각 채권자에게 위반행위 1건당 10억 원씩을 지급하라.


## 이 유

1. 채권자들의 신청을 일부 받아들이는 부분

  가. 별지 2. 신청목록 제1항 중 '□오프닝 멘트'의 "거액의 회사 돈으로 자녀들 유학

비용을 충당했다는 것" 부분, 같은 별지 제1항 중 '□기자 리포트'의 "'비비큐 윤홍근

회장의 아들, 딸 유학생활비 내역서 스케치'부터 '아들이 타고 다니던 고급차도 계약서

류 확인. 비비큐 미국 법인 명의'까지의" 부분 및 같은 별지 제3항 중 "채권자 윤혜웅

은 2008년경부터 유학생활을 하였는데 당시 미국 법인(BBDOTQ USA)에서 업무를 수

행하던 자가 채권자 윤혜웅을 돌보아 주었고, 채권자 주식회사 제너시스비비큐는 미국

갑 제7호증





법인(BBDOTQ USA)의 당해 사람에게 채권자 윤혜웅의 유학비용을 지급하여 왔다. 이처럼 채권자 주식회사 제너시스비비큐 또는 미국 법인(BBDOTQ USA)가 편법적인 방법으로 채권자 윤혜웅의 유학자금을 조달하였다"는 부분에 관하여

    1) 이 사건 기록 및 심문 전체의 취지에 의하면 아래 사실이 소명된다.

    가) 채무자가 별지 2. 신청목록 제1항, 제2항의 위 해당 부분 기재와 같이 제기하는 의혹의 상당 부분은 제보자의 진술을 주요 근거로 삼고 있어서 제보자의 진술과 제보자가 제출한 자료의 신빙성이 의혹의 진위를 판단하는 데 적지 않은 영향을 미친다. 제보자는 BBDOTQ USA(비비닷큐, 이하 '미국 법인'이라고 한다)에 근무하면서 채권자 윤혜웅의 유학생활을 뒷바라지 하는 등 채권자 윤혜웅의 유학자금의 출처 등을 잘 알 수 있는 지위에 있었던 것으로 보인다. 또한 '작은회장님, 아가씨 월지출 예상내역서' (소을 제1호증)의 회장 결재 서명, 수기로 기재된 '1. 품의 ○과장 U$ 10,000(6,000) U$ 7,000(4,000)', '2, 3월부터 시행 (서명)', 'OK', '회사비용' 부분 등을 채권자 윤홍근이 작성한 것으로 볼 만한 소명자료도 있고(소을 제2호증 감정서 참조), 제보자 명의의 JPMorgan Chase 은행 계좌에 입금된 돈(PPD ID: 2943345425)이 미국 법인으로부터 지급받은 것으로 보이기도 한다.

    나) 그러나 채권자들이 제출한 자료(각 외환송금내역, 소갑 제18호증 내지 제29호증, 제40호증 내지 제43호증, 제54호증)에 의하면, 채권자 윤홍근, 윤혜웅 명의의 계좌에서 제보자의 시티은행 계좌로 2011. 1.경부터 2016. 6.경까지 매월 약 4,000달러에서 10,000달러 가량의 돈이 정기적으로 송금되었고, 2016. 7.경 이후 현재까지 채권자 윤혜웅 명의의 계좌에서 채권자 윤혜웅의 다른 계좌로 매월 10,000달러 이상의 돈이 정기적으로 송금되었으며, 채권자 윤혜웅의 학비는 학교 계좌로 직접 송금된 사실도 확

갑 제7호증




인된다.

다) 나아가 채무자가 채권자 측과 인터뷰를 한 경위와 시기, 질문과 답변의 내용 등에다가 채권자들은 이 사건 가처분을 신청할 때까지 방송 내용을 제대로 알지 못하고 있었던 점 등에 비추어 보면, 채무자가 일방적인 취재의 일환으로 채권자 측을 찾아갔거나 뒤늦게 이를 알게 된 채권자 측이 채무자를 방문하였던 것으로 보이고, 제보자의 주장을 기초로 한 의혹 내용을 채권자들에게 알려주면서 이를 해명하거나 의견을 제출할 기회를 제대로 제공하였다고 보기 어렵다. 그로 인하여 채무자는 채권자들이 이 사건 가처분 신청 이후 제출한 채권자 윤홍근, 윤혜웅 명의의 계좌에서 제보자의 시티은행 계좌 등으로 정기적으로 국외 송금된, 학비를 포함한 유학자금의 출처에 관하여 충분히 파악하지 못하였을 개연성이 있다.

라) 한편 채권자 윤홍근, 윤혜웅 명의의 계좌에서 제보자의 시티은행 계좌로 정기적으로 송금된 돈이 채권자 윤혜웅의 유학비용으로 사용되지 아니하고 은닉되었거나 다른 용도로 사용되는 바람에 미국 법인이 제보자에게 급여 명목으로 지급한 돈을 채권자 윤혜웅의 유학비용으로 사용하였다거나 혹은 위와 같이 송금된 돈으로는 채권자 윤혜웅의 유학비용을 충당하기에 턱없이 부족하여 미국 법인이 제보자에게 급여 명목으로 지급한 돈까지 채권자 윤혜웅의 유학비용으로 대부분 사용되었다는 등의 특별한 사정이 없는 한 채권자 윤홍근, 윤혜웅 명의의 계좌에서 제보자의 시티은행 계좌 등으로 국외 송금된 돈은 채권자 윤혜웅의 유학비용으로 사용되었을 것으로 보이고, 제보자 명의의 JPMorgan Chase 은행 계좌에서 출금된 돈이 채권자 윤혜웅의 유학비용으로 그대로 사용되었음을 뒷받침할 만한 구체적인 또는 객관적인 증거는 제출되지 아니하였다.

갑 제7호증



www.scourt.go.kr
출력용바코드
음성출력용바코드



2) 위 소명사실을 통하여 알 수 있는 다음과 같은 사정, 즉 ① 제보자의 시티은행 미국 계좌로 매월 정기적으로 국외 송금된 돈을 비롯하여 상당한 액수의 유학자금 출처가 객관적인 증빙자료에 의하여 확인된 점, ② 반면 제보자가 채권자 윤혜웅의 유학자금 출처로 밝힌 것으로 보이는 자신의 JPMorgan Chase 은행 계좌에서 출금된 돈의 사용처에 관하여는 제보자의 진술 외에 이를 뒷받침할 만한 충분한 자료가 확인되거나 제출되지 아니한 점에 비추어 보면, 달리 특별한 사정이 없는 한 적어도 '작은회장님, 아가씨 월지출 예상내역서'(소을 제1호증)에 나타난 채권자 윤혜웅의 유학자금의 출처 중 채권자 윤홍근, 윤혜웅으로부터 제보자의 시티은행 미국 계좌로 매월 정기적으로 송금된 액수에 상당한 부분은 채권자들의 주장과 같이 채권자 주식회사 제너시스비비큐(이하 '채권자 회사'라고 한다)나 미국 법인의 돈이 아닌 채권자 윤홍근, 윤혜웅의 돈으로 충당되었을 개연성이 높다.

3) 결국 채무자가 별지 2. 신청목록 제1항 '□오프닝 멘트'의 "거액의 회사 돈으로 자녀들 유학비용을 충당했다는 것" 부분, 같은 별지 제1항 '□기자 리포트'의 "'비비큐 윤홍근 회장의 아들, 딸 유학생활비 내역서 스케치'부터 '아들이 타고 다니던 고급차도 계약서류 확인. 비비큐 미국 법인 명의'까지의" 부분 및 같은 별지 제3항의 "채권자 윤혜웅은 2008년경부터 유학생활을 하였는데 당시 미국 법인에서 업무를 수행하던 자가 채권자 윤혜웅을 돌보아 주었고, 채권자 회사는 미국 법인의 당해 사람에게 채권자 윤혜웅의 유학비용을 지급하여 왔다. 이처럼 채권자 회사 또는 미국 법인이 편법적인 방법으로 채권자 윤혜웅의 유학자금을 조달하였다"는 부분 기재와 같이 채권자 회사 또는 미국 법인의 돈으로 채권자 윤혜웅의 유학비용을 충당하였다는 의혹을 제기함에 있어서 채권자 윤홍근, 윤혜웅의 돈으로 충당된 유학비용도 상당 부분 객관적인 증빙자

갑 제7호증

Case 1:19-cv-10278-PBS   Document 6-1   Filed 05/13/19   Page 64 of 71




료에 의하여 확인된다는 점을 함께 언급하지 아니한 채 이 사건 방송과 같은 내용이 그대로 보도될 경우 채권자들은 쉽게 회복할 수 없는 명예와 신용상의 불이익을 입을 것으로 보인다. 따라서 채권자들의 신청 중 위 각 방송 내용과 관련하여 별지 1. 인용목록 기재와 같은 내용의 방송 등의 금지를 구하는 부분은 그 피보전권리 및 보전의 필요성이 소명된다.

　나. 간접강제 신청 부분에 관하여

　채무자가 이 사건 가처분 결정에도 불구하고 주문 제1항 기재 명령을 위반할 개연성을 배제할 수 없으므로 가처분 결정의 실효성을 보장하기 위하여 간접강제를 명하기로 하되 간접강제 금액은 채권자들이 이 사건 가처분 신청에 이르게 된 경위, 채무자의 태도 및 위반가능성 등 이 사건 기록 및 심문 전체의 취지에 나타나는 여러 사정을 고려하여 주문 제2항 기재와 같이 정한다.

2. 채권자들의 신청을 받아들이지 않는 부분

　가. 별지 2. 신청목록 제2항 중 "채권자 윤혜웅이 2016년경 미국 뉴저지에서 E2 비자를 취득하는 과정에서 부당한 방법으로 투자금을 지원받았다"는 부분에 관하여

　채무자가 제출한 방송 대본(2018. 11. 14.자 준비서면 및 별지 2. 신청목록 제1항 참조)에 의하면, 채권자 윤혜웅이 2016년경 미국 뉴저지에서 E2 비자를 취득하는 과정에서 부당한 방법으로 투자금을 지원받았다는 내용은 채무자가 이 사건 방송을 통해서 방영하려는 내용에 해당하지 않는다. 따라서 이 부분의 방송 등 금지를 구하는 채권자들의 신청은 그 피보전권리 및 보전의 필요성이 소명되지 아니하므로 이를 받아들일 수 없다.

　나. 별지 1. 신청목록의 나머지 부분, 별지 2. 신청목록 제2항 중 "채권자 윤혜웅은

갑　제7호증




E2 비자를 신청하면서 자신의 직책 및 업무를 'Full-time director'로 소명하였는데, 실제로 미국 법인에서 근무를 하지 않았고, 만일 근무를 하였다고 하더라도 보스턴과 맨해튼 등 뉴저지 외의 지역에서 하였으며, 이로써 이민법을 위반하였다"는 부분 및 같은 별지 제3항 중 "채권자 윤혜웅은 2016. 8. 1.부터 2017. 7. 31.까지 미국 법인으로부터 매달 약 미화 6,000달러를 지급받았는데, 이는 사실상 유학생활에 필요한 비용을 지급한 것이다"는 부분에 관하여

채무자의 이 사건 방송 목적과 내용, 준비 중인 방송의 방식, 채무자가 제기하는 의혹의 내용 및 이에 관하여 채무자가 나름대로 수집한 근거자료의 내용과 정도와 채권자 윤혜웅의 학력·경력·나이·능력 및 전공, 채권자 윤혜웅이 미국 법인에서 담당하기로 근로계약을 체결한 직위 및 급여의 정도, 미국 법인 소재지와 채권자 윤혜웅이 재학 중인 학교의 소재지의 물리적인 거리 등 이 사건 기록 및 심문 전체의 취지에 나타난 여러 사정에 비추어 보면, 채권자들이 제출한 자료만으로는 이 사건 방송 중 별지 2. 신청목록 제1항의 나머지 부분, 별지 2. 신청목록 제2항의 "채권자 윤혜웅은 E2 비자를 신청하면서 자신의 직책 및 업무를 'Full-time director'로 소명하였는데, 실제로 미국 법인에서 근무를 하지 않았고, 만일 근무를 하였다고 하더라도 보스턴과 맨해튼 등 뉴저지 외의 지역에서 하였으며, 이로써 이민법을 위반하였다(또는 이민법을 위반한 소지가 있다는 취지를 포함한다)"는 부분 및 같은 별지 제3항 중 "채권자 윤혜웅은 2016. 8. 1.부터 2017. 7. 31.까지 미국 법인으로부터 매달 약 미화 6,000달러를 지급받았는데, 이는 사실상 유학생활에 필요한 비용을 지급한 것이다"는 부분은 상당한 근거를 갖춘 합리적인 의혹제기가 가능한 범위 내에 있는 것으로 보이고 달리 그 표현내용이 진실이 아니라거나 그것이 공공의 이해에 관한 사항으로서 그 목적이 오로지 공공

갑 제7호증

 

의 이익을 위한 것이 아니라고 보기 어려우므로 이 부분의 방송 등 금지를 구하는 채권자들의 신청은 그 피보전권리에 대한 소명이 부족하여 받아들이지 아니한다.

## 3. 결론

채권자들의 신청은 위 인정범위 내에서 이유 있으므로 이를 받아들이고, 각 나머지 신청은 이유 없으므로 이를 모두 기각하기로 하여 주문과 같이 결정한다.

2018. 11. 15.

재판장 판 사 김 도 형

판 사 박 강 민

판 사 백 승 준




별지 1.

# 인 용 목 록

아래와 같은 내용의 채권자들의 입장이나 해명을 소개·반영하지 아니한 채, 별지 2. 신청목록 제1항 '□오프닝 멘트'의 "거액의 회사 돈으로 자녀들 유학비용을 충당했다는 것" 부분과 같은 별지 제1항 '□기자 리포트'의 "'비비큐 윤홍근 회장의 아들, 딸 유학 생활비 내역서 스케치'부터 '아들이 타고 다니던 고급차도 계약서류 확인. 비비큐 미국 법인 명의'까지의" 부분을 그대로 방송하거나 "채권자 윤혜웅은 2008년경부터 유학생 활을 하였는데 당시 미국 법인에서 업무를 수행하던 자가 채권자 윤혜웅을 돌보아 주 었고, 채권자 회사는 미국 법인의 당해 사람에게 채권자 윤혜웅의 유학비용을 지급하 여 왔다. 이처럼 채권자 회사 또는 미국 법인이 편법적인 방법으로 채권자 윤혜웅의 유학자금을 조달하였다."고 방송하는 내용

---

○ 채권자 회사 또는 미국 법인의 돈으로 채권자 윤혜웅의 유학자금을 조달하였다 는 의혹과 관련하여 반영할 필요가 있는 채권자들의 입장 등

　가. 채권자들은 외환송금내역서 등을 제시하면서 '채권자 윤홍근, 윤혜웅이 제보자의 시 티은행 계좌로 매월 정기적으로 돈을 송금하여 채권자 윤혜웅의 유학자금을 충당하 였다'고 해명한다.

　나. 채권자들이 해명자료로 제시한 외환송금내역서 등 객관적인 자료의 일부를 위 가.항 기재 채권자들의 해명내용과 함께 소개한다.

---

갑 제7호증




서울남부지법 2018가합113738 정정보도등 청구의 소 2018.11.20 제출 원본과 상위 없음

별지 2.

## 신 청 목 록

1. 채무자가 'BBQ 작은 회장님의 수상한 미국 생활(가제)'로 제출한 아래와 같은 방송

    대본의 내용

> 제목 : BBQ '작은 회장님'의 수상한 미국 생활(가제)
>
> ❑ 오프닝 멘트
>
> 지난 9월, 제보가 접수됐다...
> 자수성가한 중견기업 대표가
> 거액의 회삿돈으로 자녀들 미국 유학 비용을 충당했다는 것.
> 한국 프렌차이즈의 살아있는 성공신화,
> BBQ 윤홍근 회장 얘기...   끈질긴 K가 확인해본다...
> ===========================================
>
> ❑ 기자 리포트
>
> 비비큐 윤홍근 회장의아들, 딸 미국 유학 생활비 내역서 스케치...
> 17,000달러, 우리 돈 2천만 원.
> 비비큐 미국 법인 직원 급여에서 처리하겠다는 내용
> 필적 감정. 결재란의 윤 회장 싸인과 다른 비비큐 내부 문서와 비교
>
> <감정인 인터뷰>
> "동일인의 필적일 가능성이 매우 높은..."
> ===========================================
>
> 제보자를 만나러 미국행.
> 윤 회장 아들이 초등학생 때부터 같은 집에 살면서 제보자가 돌봐줘.
> 윤 회장의 아들이 2년 동안 살았던 집 찾아감... 임대료는 월 550만 원.
> 아들이 타고 다니던 고급차도 계약 서류 확인.
> 비비큐 미국 법인 명의
>
> <제보자 인터뷰 내용>
> 불법인 거 알고 있었지만, 처자식 있는 상황에서 어쩔 수 없는 선택
> ===========================================
>
> 윤 회장 아들이 입학했다는 하버드대학 확인 취재.
> 학부가 아닌 익스텐션 스쿨. 학생 비자를 내주지 않는 평생교육원 개념.

갑 제7호증

서울남부지법 2018가합113738 정정보도등 청구의 소 2018.11.20 제출 원본과 상위 없음




<하버드대학교 관계자 인터뷰>
-비자 어떻게 지원하느냐.
=학기 중엔 학생 비자 지원 안한다.

윤 씨의 비자 서류 스케치.
미국 비비큐의 연봉 6만 달러 상근직 이사...
E2(투자 비자) 신청.
비자 요청 사유는 윤 씨가 필수 직원이라는 것.
상근이사로 돼 있는 뉴저지 미국법인 본사 확인 취재.

<미국법인 관계자 녹취 내용>
-직원 몇명이냐. 주재원 많나.
=주재원은 한명. 나머지는 현지 고용.

미국 취재가 한창일 때 비비큐 측이 반론권 차원에서 서울 KBS 방문.

<비비큐 관계자 녹취 내용>
=보스턴 직영 매장에서 점장, 쉐프
관리하는 역할 한다.

<미국 이민법 전문 변호사 인터뷰>
=뉴저지에 기업이 있고 5시간 떨어진
보스턴에 가서 계속 산다, 그건 이상하다.
이민법 위반 소지가 있다.

보스턴 매장 확인 취재.
2016년 7월 7일 오픈(윤 씨가 하버드 평생교육원 입학하기 두 달 전 시점)
반나절 기다리고 다음날 다시 찾았지만 윤 씨 볼 수 없어.
전화번호 확보해 확인 전화.
-KBS 기자다. 출근 안하더라. 뉴저지 직원으로 비자 받았는데 왜 보스턴?
=나중에 제대로 얘기하겠다

=====================================================

갑 제7호증

서울남부지법 2018가합113738 정정보도등 청구의 소 2018.11.20 제출 원본과 상위 없음





비비큐 측 해명...

1. 아들 학비와 생활비 등 유학비용은 모두 윤 회장 또는 아들 돈으로 충당.
2. 업무 특성상 매장 직원들이 앤런 윤의 존재를 모를 수도 있다.
3. 직원들이 윤 회장 아들을 모른다고 한 것은 본사 지침에 따른 것.
4. 윤 회장 아들은 출근하지 않아도 업무를 수행할 수 있는 직책이다.
5. 매장이 잘 운영되고 있어 업무를 충실하게 수행하는 것으로 판단.

윤 회장에게 직접 해명을 듣고 반론권 주는 차원에서
11.07 오전 출근길 인터뷰 시도.

- 회장님 아드님 관련해서 여쭤본다
=....
-회삿돈으로 생활비 대셨나? 대답해달라
=카메라 밀치고 도망치듯...

클로징


2. 채권자 윤혜웅은 2016년 경 미국 뉴저지에서 E2 비자를 취득하였는데, 그 과정에서
   부당한 방법으로 투자금을 지원받았다. 채권자 윤혜웅은 E2 비자를 신청하면서 자
   신의 직책 및 업무를 'Full-time director'로 소명하였는데, 실제로 미국 법인에서 근
   무를 하지 않았고, 만일 근무를 하였다고 하더라도 보스턴과 맨해튼 등 뉴저지 외의
   지역에서 하였으며, 이로써 이민법을 위반하였다.

3. 채권자 윤혜웅은 2016. 8. 1.부터 2017. 7. 31.까지 미국 법인으로부터 매달 약 미화
   6,000달러를 지급받았는데, 이는 사실상 유학생활에 필요한 비용을 지급한 것이다.
   채권자 윤혜웅은 2008년경부터 유학생활을 하였는데 당시 미국 법인에서 업무를 수
   행하던 자가 채권자 윤혜웅을 돌보아 주었고, 채권자 회사는 미국 법인의 당해 사람
   에게 채권자 윤혜웅의 유학비용을 지급하여 왔다. 이처럼 채권자 회사 또는 미국 법
   인이 편법적인 방법으로 채권자 윤혜웅의 유학자금을 조달하였다.   끝.

갑 제7호증

서울남부지법 2018가합113738 정정보도등 청구의 소 2018.11.20 제출 원본과 상위 없음




# 정본입니다.

2018. 11. 15

서울남부지방법원

법원주사보  김시일  

※ 각 법원 민원실에 설치된 사건검색 컴퓨터의 발급번호조회 메뉴를
이용하거나, 담당 재판부에 대한 문의를 통하여 이 문서 하단에 표시된
발급번호를 조회하시면, 문서의 위,변조 여부를 확인하실 수 있습니다.

갑 제7호증