**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
_____
                                )
HYEWOONG YOON,                  )
                                )
                 Plaintiff,     )
                                )   Consolidated Civil Actions
v.                              )        No. 19-10278-PBS
                                )        No. 19-10280-PBS
SEYEON LEE, JUHYUNG LEE, and    )        No. 19-10281-PBS
KOREAN BROADCASTING SYSTEM,     )
                                )
                 Defendants.    )
_____)
```

**MEMORANDUM AND ORDER**

December 20, 2019

Saris, C.J.

**INTRODUCTION**

This dispute arises out of a television broadcast aired in
South Korea and posted on the internet about Hyewoong Yoon and
his father, who is the Chief Executive Officer of an
international Korean restaurant company. Yoon alleges that
Korean Broadcasting System ("KBS"), and its employees, Seyeon
Lee and Juhyung Lee, unlawfully wiretapped him in Massachusetts
and aired the recordings on various internet sites watched in
the United States. He asserts claims for violation of the
Massachusetts Wiretapping Statute (Count I), defamation (Count
II), and commercial disparagement, injurious falsehood, and
trade libel (Count III).

Yoon originally filed three separate lawsuits against KBS, Seyeon Lee, and Juhyung Lee. The Court consolidated all three cases into this action on June 3, 2019. Prior to the consolidation, Defendants individually filed motions to dismiss all three claims for lack of subject matter jurisdiction. All three motions sought to dismiss the claims based on the Foreign Sovereign Immunities Act and the doctrine of forum non conveniens. Juhyung Lee also moved to dismiss the claims on the basis that the Court lacks personal jurisdiction over him.

After hearing, the Court **ALLOWS IN PART** and **DENIES IN PART** Defendants' motions to dismiss.

## FACTUAL BACKGROUND

The following factual background is drawn from the complaint and evidence presented by the parties. In deciding a motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), the Court may consider evidence outside of the complaint. See Valentin v. Hosp. Bella Vista, 254 F.3d 358, 363-64 (1st Cir. 2001).

## I.   The Parties

Yoon is a 22-year-old South Korean citizen, living temporarily in Massachusetts on an E-2 Visa.[1] Yoon's father,

---

[1]    The Employee E-2 visa is granted to employees of a corporation of the same nationality of the principal foreign employer, who meet the definition of "employee" under relevant

HongGeun Yoon ("Yoon Sr."), is the Chief Executive Officer of BB.Q Chicken ("BB.Q"). BB.Q has approximately 300 restaurants in over 50 countries, including one location in Allston, Massachusetts.

KBS is the public broadcasting network of the Republic of Korea ("South Korea"). The South Korean government founded KBS, as its sole capital investor, pursuant to Article 43 of the Broadcasting Act. The Broadcasting Act established KBS to provide "a culture of fair and objective broadcasting in Korea," and to deliver effective broadcasting both at home and abroad. Dkt. No. 6 at 2. Though KBS functions much like a private media company, the South Korean government retains significant influence over its operations. KBS annually submits its operating budget and provides financial statements to the National Assembly (South Korea's legislative body). Additionally, the Broadcasting Act provides that the South Korean president shall appoint KBS's president. The president of South Korea also retains the final appointment power of KBS's Board of Directors, after the Korean Communications Commission nominates prospective appointees. Though KBS does receive government subsidies, it also generates revenue from the

---

law, and are either engaged in executorial or managerial duties, or have special qualifications.

traditional sources relied on by private media companies. KBS accepts regular commercial advertisers, albeit subject to the government's pre-approval. KBS charges its advertisers fees that vary according to the visibility of the desired timeslot. KBS's Board of Directors determines the licensing fees, though these fees are ultimately subject to approval by the South Korean National Assembly.

KBS takes steps to limit potential political influence. For example, KBS prohibits its Board of Directors from being actively affiliated with political parties and, during the appointment process, anyone who has been active within the past three-years is subject to disqualification. While the company submits operational plans and financial accounting to the government, KBS formulates those plans independently.

Seyeon Lee is a news reporter for KBS, working in the Social Affairs Division 2, News and Sports Department. Juhyung Lee is her supervisor and the manager of that department.

## II.   **The KBS Broadcast**

Yoon moved to the United States in 2007. For approximately nine-years, he lived with a guardian, Hyunwook Joo ("Joo"), in New Jersey, until he moved to Massachusetts in 2016. At some point in 2018, KBS became aware of allegations that Yoon Sr. was involved in an embezzlement scheme, wherein Yoon Sr. allegedly misappropriated BB.Q funds to finance his son's education and

living expenses. In an attempt to investigate this accusation, KBS dispatched Seyeon Lee to the United States on October 25, 2018.

She first visited New Jersey, where she interviewed Yoon's former guardian. In the interview, Joo discussed his experience caring for Yoon and relayed his familiarity with the alleged embezzlement scheme. After this interview, Seyeon Lee traveled to Boston, hoping to locate Yoon himself. While there, she visited Harvard University, where Yoon was once enrolled in its Extension School. In a recorded exchange with a school employee, she inquired into whether the school would have provided Yoon with a student visa. The school employee confirmed that Harvard University does not provide visas to Extension School students. Ultimately, KBS concluded that Yoon resides in the United States on an E-2 Visa. KBS reported that it had obtained this document, which listed Yoon as a "necessary" employee of BB.Q and referred to him as a full-time director of BB.Q.

Seyeon Lee visited BB.Q's Allston location on two consecutive days. Yoon was absent on both occasions. While there, Seyeon Lee recorded an interview with two employees, neither of whom had met Yoon or observed him at the restaurant. One of these employees did note, however, that he had previously heard about Yoon.

Seyeon Lee then called Yoon. During their conversation, Seyeon Lee confronted Yoon about his absence from work. She also probed a discrepancy between his E-2 Visa, which listed him as an employee in New Jersey, and his statements that he currently lives in Boston. Unbeknownst to Yoon, Seyeon Lee secretly recorded the entire phone call.

KBS later featured this recording, and the two other recorded interviews, as part of the first video in a two-part news special spotlighting the alleged embezzlement scheme. KBS broadcasted both videos online through several different websites, including its own site and YouTube. The first video, the one at issue before this Court, garnered approximately one million online views through various web outlets.

## III. **The Korean Litigation**

On November 9, 2018, before KBS aired the first video, Yoon and Yoon Sr. applied for a preliminary injunction in South Korea to prevent the broadcast from airing. The Seoul Southern District Court granted a conditional injunction, which allowed KBS to broadcast its video provided the news special accurately reflected both parties' viewpoints. After the video aired on November 20, 2018, the Yoons filed a lawsuit in South Korea alleging that KBS had violated the conditional injunction ruling. The Seoul Southern District Court dismissed that suit, which the Yoons have contested in a pending appeal. On November

20, 2018, the Yoons also filed a defamation and libel suit in
South Korea against all three Defendants in connection with the
broadcast (the "South Korean Action"). As damages, they sought
KRW 3 billion (approximately $2.5 million) from the defendants.
In addition to their civil suit, the Yoons filed a separate
defamation action against the defendants under the Korean
Criminal Code. The criminal matter is currently under
investigation by Korean authorities. Relatedly, Yoon Sr. is the
subject of an ongoing South Korean criminal investigation for
allegedly misappropriating BB.Q's funds.

## DISCUSSION

I.   **The Foreign Sovereign Immunities Act**

Defendants argue that this Court lacks subject matter
jurisdiction under the Foreign Sovereign Immunities Act ("FSIA")
because KBS is the public broadcasting network of South Korea
and immune from suit in the United States.[2]

"[T]he FSIA provides the sole basis for obtaining
jurisdiction over a foreign state in federal court." Argentine
Republic v. Amerada Hess Shipping Co., 488 U.S. 428, 439 (1989).
"It establishes a presumption of foreign sovereign immunity from

---

[2] In the initial complaints, Plaintiff asserted subject matter
jurisdiction based on diversity, but the Court does not have
jurisdiction under 28 U.S.C. § 1332 because all parties are
foreign citizens. The Court, however, does have jurisdiction
under 28 U.S.C. § 1330(a).

the jurisdiction of the courts of the United States unless one of its enumerated exceptions to immunity applies." Universal Trading & Inv. Co. v. Bureau for Representing Ukr. Interests in Int'l and Foreign Courts, 727 F.3d 10, 16 (1st Cir. 2013). This immunity extends to foreign officers and agents when the foreign instrumentality is a required party or when the action against the agent in his official capacity should be treated as an action against the foreign state itself as the real party in the law. See Samantar v. Yousuf, 560 U.S. 305, 324-325 (2010). Although numerous circuits have addressed the burdens of the proof and production when a defendant raises and FSIA defense, the First Circuit has not yet done so. Still, it has suggested that a burden-shifting framework may be appropriate. See Universal Trading & Inv. Co., 898 F. Supp. 2d 301, 309 (D. Mass. 2012), aff'd, 727 F.3d 10 (1st Cir. 2013) (assuming, without deciding, that a burden-shifting framework applies.). Thus, the Court will use the burden-shifting framework set out in Virtual Countries, Inc. v. Republic of South Africa, 300 F. 3d 230, 242 (2d Cir. 2002).

Yoon does not dispute that KBS has presented a prima facie case that it is an instrumentality of the Republic of Korea as defined by 28 U.S.C. § 1603(b) and that the two individual defendants are agents of KBS. He argues instead that he has met his burden of producing evidence that KBS's activities qualify

under the "commercial activity" exception pursuant to

§ 1605(a)(2).[3] Under the commercial activity exception, a foreign

state is not immune from the jurisdiction of the United States

courts when its actions are:

> Based [1] upon a commercial activity carried on in
> the United States; or [2] upon an act performed in
> the United States in connection with a commercial
> activity of the foreign state elsewhere; or [3] upon
> an act outside the territory of the United States
> [and] in connection with a commercial activity . . .
> [that] causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).

Yoon's wiretapping claim satisfies the second clause of the

commercial activity exception. All of the elements necessary for

Yoon to recover under his wiretapping claim are "based upon"

acts that occurred in the United States. See OBB Personenverkehr

v. Sachs, 136 S. Ct. 390, 396 (2015) (construing the "based upon

language to require a plaintiff to establish "those elements of

a claim that, if proven, would entitle a plaintiff to relief

under his theory of the case[]"). Equally apparent is that

Seyeon Lee conducted the secret recording "in connection" with

KBS's commercial activity of producing the video. See Anglo-

Iberia Underwriting Mgmt. v. P.T. Jamsostek, 600 F.3d 171, 178

(2d 2010) (discussing the substantive connection required to

---

[3]    He also argues that the "tortious activities exception"
under § 1605(a)(2) applies. The Court does not reach this
argument because it concludes that the commercial activities
exception provides jurisdiction.

satisfy the "in connection" with language). KBS featured the recording as a central component of its investigatory news special, forming a direct causal link between the act performed in the United States and its commercial activity, the news broadcast. See 28 U.S.C. § 1603(d)(providing that commercial activity "shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose[]"); see also Bryks v. Can. Broad. Corp., 906 F. Supp. 204, 207-8 (S.D.N.Y. 1995)(state-sponsored foreign news agency's broadcast was a commercial activity because these types of broadcasts are "customarily carried on for profit" by private individuals and corporations, despite the corporation not earning profits and relying almost exclusively on state subsidies for funding); L.A. News Serv. v. Conus Commc'ns Co., 969 F. Supp. 579, 585, 586 (C.D. Cal. 1997)(determining that television broadcasting is still a commercial activity regardless of whether a state-sponsored media agency accepted advertising or earned profits because "many private parties do 'trade and traffic' in the television news business"). Yoon therefore has satisfied his burden of producing evidence that the second clause of the FSIA's commercial activity exception applies to his wiretapping claim. KBS has not introduced any evidence to the contrary.

Yoon's defamation and libel claims present a closer question.[4] He contends that the first clause of the commercial activity exception applies, emphasizing that KBS both recorded and later broadcast the interviews in the United States. Defendants counter that Yoon has failed to meet his burden of demonstrating that the "entire tort" occurred within the United States. Jerez v. Republic of Cuba, 775 F.3d 419, 424 (D.C. Cir. 2014) (noting that "[t]he law is clear that the entire tort— including not only the injury but also the act precipitating that injury—must occur in the United States" (internal quotations omitted)). But Yoon has established that KBS, through Juhyung Lee and Seyeon Lee, made the recordings in United States and later broadcast them here. Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC, 813 F.3d 98, 114 n.9 (2d Cir. 2016) (stating that where harm is done to the reputation of a person, the place of wrong is where the defamatory statement is communicated). Specifically, Yoon alleges that KBS broadcast the video containing the recordings on its website and YouTube. He also has submitted evidence that KBS has an annual United States' viewership of two and a half million people, KBS's

---

[4]     Defendants had argued that claims for defamation and trade libel were barred by 28 U.S. C. § 1605(a)(5)(B), but the First Circuit has referred to this exception as the "noncommercial tort exception." Merlini v. Canada, 926 F.3d 21, 25 (1st Cir. 2019).

second largest foreign audience, and the video itself has
received over one million views on the internet. Therefore,
there is sufficient evidence for the Court to infer that by
placing the video on its website and YouTube, KBS broadcasted
the video in the United States. KBS has not rebutted this
evidence, and has not met its burden of establishing, by a
preponderance of the evidence, that it is immune from suit. See
Virtual Countries, Inc., 300 F.3d at 241 (noting that the
"ultimate burden of persuasion . . . remains with the alleged
foreign sovereign").

Accordingly, the Court has jurisdiction over Yoon's claims
pursuant to the FSIA's commercial activity exception.

## II.  **Forum Non Conveniens**

Defendants argue that even if the FSIA does not bar Yoon's
claims, the Court still must dismiss them pursuant to the
doctrine of forum non conveniens.

Forum non conveniens permits dismissal of a case, even if
the Court has jurisdiction, when "an alternative forum is
available in another nation which is fair to the parties and
substantially more convenient for them or the courts." Mercier
v. Sheraton Int'l, Inc., 981 F.2d 1345, 1349 (1st Cir. 1992).
"When a defendant moves for dismissal on forum non conveniens
grounds, it bears the burden of showing both that an adequate
alternative forum exists and that considerations of convenience

and judicial efficiency strongly favor litigating the claim in the alternative forum." <u>Iragorri v. Int'l Elevator, Inc.</u>, 203 F.3d 8, 12 (1st Cir. 2000). Provided an adequate alternative forum is available, the Court must also analyze the private and public interest factors. Dismissal is only proper if weighing the private and public interest factors "strongly favor[s]" resolving the claims in the alternative forum. <u>Id.</u>; <u>see</u> <u>also</u> <u>Adelson v. Hananel</u>, 510 F.3d 43, 54 (1st Cir. 2007) (declining to dismiss where the balance of factors was "in equipoise"). While a plaintiff receives "some degree of deference for his original choice of forum," a foreign plaintiff's decision receives less deference than an American plaintiff's choice because "the assumption that the chosen forum is appropriate [is in such cases] 'less reasonable.'" <u>Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.</u>, 549 U.S. 422, 430 (2007) (quoting <u>Piper Aircraft Co. v. Reyno</u>, 454 U.S. 235, 255-56 (1981)).

    a. <u>Defamation and Trade Libel Claims (Counts II and III)</u>

    The South Korean Action is proof that there is an alternative forum for Yoon's claims. South Korea has no statutory cap on damages for civil defamation suits. Yoon has sought over $2.5 million in the South Korean civil action which, when compared to remedies that other courts have deemed adequate, appears more than sufficient. <u>See</u> <u>Loya v. Starwood Hotels & Resorts Worldwide, Inc.</u>, 583 F.3d 656, 664, 666 (9th

13

Cir. 2009) (holding that Mexico provided an adequate forum even
though it capped wrongful death damages at $12,000 to $13,000);
Gonzalez v. Chrysler Corp., 301 F.3d 377, 380-82 (5th Cir. 2002)
(finding Mexico to be an adequate forum even though it limited
recovery for the loss of a child's life at $2,500). Accordingly,
South Korea provides an adequate alternative forum for Yoon's
defamation and libel claims.

With respect to the private interest factors, the ease of
access to proof will be far greater in South Korea. Critical to
resolving the defamation and libel claims is whether Yoon Sr. in
fact misappropriated BB.Q funds, which will depend primarily on
South Korea-based witnesses. Yoon objects that his former
guardian in the United States, Joo, also will be a key witness.
But he is only one witness. Based on the number of foreign
witnesses required to resolve these claims, and factoring in the
cost of providing translators for those witnesses, the Court
concludes the trial costs also would likely be greater in the
United States.

Likewise, the public interest factors warrant dismissal of
the defamation and trade libel claims. See Iragorri, 203 F.3d at
12. This forum has less interest in resolving a defamation
action between foreign citizens the substance of which involves
a foreign corporation's alleged embezzlement scheme. Moreover,
the Court potentially would be faced with difficult questions

14

regarding the application of foreign law. Most troublesome is
the ongoing South Korean criminal investigation into Yoon Sr.
for his involvement in the alleged embezzlement, the outcome of
which may be determinative to the defamation and libel claims.
The Court would need to decide what weight to afford the outcome
of Yoon's criminal defamation suit in South Korea. This would
present difficult questions regarding foreign law and test
principles of international comity. See Sinochem Int'l Co., 549
U.S. at 435.

Accordingly, although Yoon's choice of forum is entitled to
some deference, Defendants have met their burden of
demonstrating with respect to the defamation and trade libel
claims that "considerations of convenience and judicial
efficiency strongly favor [resolving] the claim in the
alternative forum."[5] Iragorri, 203 F.3d at 12.

   b. Wiretapping Claims

The analysis of Yoon's wiretapping claims is different
because the alleged injury, an invasion of privacy,
fundamentally differs from the reputational damages alleged in
connection with the defamation and libel claims. See Mass. Gen.
Laws ch. 272 § 99Q ("Any aggrieved person whose oral or wire

---

[5]    Because the Court is dismissing the defamation and trade
libel claims under the doctrine of forum non conveniens, the
Court does not address the Defendants' other arguments
concerning these claims.

communications were intercepted . . .  or <u>privacy were violated</u>
by means of an interception . . .  shall have a civil cause of
action" (emphasis added)). It is essential for the adequate
alternative forum analysis that the foreign court be capable of
addressing the type of claim asserted in the domestic suit. <u>See</u>
<u>Interface Partners Int'l Ltd. v. Hananel</u>, 575 F.3d 97, 103 (1st
Cir. 2009) (holding that an adequate alternative forum existed
because Israel's courts address the sort of breach of contract
claim that the plaintiff asserted in the United States); <u>accord</u>
<u>Associação Brasileira de Medicina de Grupo v. Stryker Corp.</u>, 891
F.3d 615, 620 (6th Cir. 2018) (considering in its adequate
alternative forum analysis whether the foreign court could
address the type of harm alleged). An alternative forum is
inadequate if it "does not permit litigation of the subject
matter of the dispute." <u>See</u> <u>Mercier</u>, 981 F.2d at 1350 (quoting
<u>Piper</u>, 454 U.S. at 265 n.22). It is undisputed that South Korean
law does not recognize a civil cause of action for the non-
consensual recording by one party of a phone conversation.
Therefore, South Korea does not afford an adequate alternative
forum for Yoon's wiretapping claims, and the Court declines to
dismiss that claim on the basis of forum non conveniens.

### III. **Personal Jurisdiction**

Juhyung Lee also argues that the wiretapping claim against him should be dismissed for lack of personal jurisdiction. Yoon counters that Seyeon Lee's contacts with Massachusetts can be imputed to Juhyung Lee because she was his agent. It is undisputed that Seyeon Lee's secret recording of Yoon in Massachusetts subjects her to the Court's personal jurisdiction. "For purposes of personal jurisdiction, the actions of an agent may be attributed to the principal." Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 55 (1st Cir. 2002). "Whether or not an agent is initially authorized to act on behalf of a principal, the agent's actions may be attributed to the principal . . . if the principal later ratifies the agent's conduct." Daynard, 290 F.3d at 55. Ratification can be demonstrated through "an agent's conduct after the fact, by 'acquiesc[ing] in the agent's action, or fail[ing] promptly to disavow the unauthorized conduct after disclosure of material facts.'" Fergus v. Ross, 79 N.E.3d 421, 424 (Mass. 2017) (quoting Licata v. GGNSC Malden Dexter LLC, 2 N.E.3d 840, 847 (Mass. 2014). In KBS's answer to Plaintiff's interrogatories, it concedes that Juhyung Lee authorized Seyeon Lee's trip to Massachusetts and subsequently assisted with the production of the broadcast that included the illicit recording. This is sufficient for the Court to exercise personal jurisdiction over

Juhyung Lee on the basis of Seyeon Lee's contacts with the forum. See Daynard, 290 F.3d at 63.

## IV.  **Abstention**

Finally, Defendants contend that if any claims survive, the Court nonetheless should dismiss or stay the case in deference to the South Korean Action. Neither the First Circuit nor the Supreme Court has addressed whether and under what circumstances a federal court may abstain from exercising its jurisdiction in deference to a related action pending in a foreign jurisdiction. Rapid Pharm. AG v. Kachroo, 180 F. Supp. 3d 96, 100 (D. Mass. 2015) (discussing abstention doctrine in the context of international parallel litigation). But this Court previously addressed these questions in Goldhammer v. Dunkin' Donuts, Inc., 59 F. Supp. 2d 248 (D. Mass. 1999).

"Federal courts have the inherent power to stay an action based on the pendency of a related proceeding in a foreign jurisdiction," and "the policies underpinning international abstention . . . are rooted in concerns about international comity." Id. at 251-252. International comity is "more a matter of grace than a matter of obligation," and is a "doctrine that counsels voluntary forbearance when a sovereign which has a legitimate claim to jurisdiction concludes that a second sovereign also has a legitimate claim to jurisdiction under principles of international law.'" Id. (quoting United States v.

18

Nippon Paper Indus. Co., 109 F.3d 1, 8 (1st Cir. 1997)). The
Court considers six-factors: (1) the similarity of parties and
issues involved in the foreign litigation; (2) the promotion of
judicial efficiency; (3) the adequacy of relief available in the
alternative forum; (4) the issues of fairness to and convenience
of the parties, counsel, and witnesses; (5) the possibility of
prejudice to any of the parties; and (6) the temporal sequence
of the filing of the actions. Id. at 252-53.

Several factors support staying this action. The parties
and the issues are similar; it is inefficient and inconvenient
for the parties and witnesses to have parallel litigation in two
forums; the South Korean Action was filed first and is ongoing.
One factor -- adequacy of relief -- supports denying Defendants'
request for a stay. However, the outcome of the South Korean
Action nonetheless could affect the availability of relief in
this action. The Wiretapping Statute provides for actual
damages, liquidated damages, and/or punitive damages. See Mass.
Gen. Laws ch. 272 § 99Q. While the statute provides little
guidance for calculating actual damages, that endeavor likely
would require the Court to consider the injury Yoon suffered as
a result of the KBS broadcast. And those damages might overlap
the with any damages award in the South Korean Action. In other
words, a successful outcome in the South Korean Action could
result in a damages award that partially accounts for the

19

available damages under the Wiretapping Statute. The Court therefore will stay the case pending the resolution of the South Korean Action. <u>See</u> <u>Tarazi v. Truehope, Inc.</u>, 958 F. Supp. 2d 428, 435 (S.D.N.Y. 2013) (staying an action because the ongoing parallel litigation in Canada would be "instructive on the ultimate resolution" of the stayed action).

### ORDER

For the foregoing reasons, Defendants' motions to dismiss are **ALLOWED IN PART** and **DENIED IN PART**. Yoon's defamation and trade libel claims are dismissed but his wiretapping claims survive. The case is stayed pending the outcome of the South Korean Action.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
Chief United States District Judge